665 So.2d 634 (1995)
Lee Roy JOYNER, Plaintiff-Appellant,
v.
George M. WEAR, Jr., et al., Defendants-Appellees.
No. 27631-CA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 1995.
Writ Denied February 28, 1996.
*636 Bezou & Matthews by Robert H. Matthews, New Orleans, for Appellant/Defendant-in-Rule Lee Roy Joyner.
Galloway, Johnson, Tompkins & Burr by J. Michael Johnson, Larry G. Canada, New Orleans, for Appellant/Defendant-in-Rule Robert H. Matthews.
Deutsch, Kerrigan & Stiles, L.L.P. by Nancy J. Marshall, New Orleans, for Appellees/Plaintiffs-in-Rule/Cross Appellants Joseph D. Cascio, Jr., and Hayes, Harkey, Smith, Cascio & Mullens.
Mayer, Smith & Roberts, L.L.P. by Caldwell Roberts, David F. Butterfield, for Appellees/Plaintiffs-in-Rule/Cross Appellants George M. Wear, Jr., and Shotwell, Brown & Sperry.
Before SEXTON and BROWN, JJ., and CLARK, J. Pro Tem.
CLARK, Judge Pro Tem.
The plaintiff, Dr. Lee Roy Joyner, appeals from the trial court's dismissal of his suit alleging defamation and ethical violations by *637 two attorneys who represented adverse parties in previous litigation. The plaintiff and his attorney also appeal from the trial court's imposition of sanctions against them for filing the suit. The defendant attorneys and their law firms answered the appeal, asserting that the sanctions imposed were inadequate and seeking damages for frivolous appeal.
For the reasons assigned below, we affirm the trial court's granting of the defendants' motions for summary judgment and pretermit consideration of the trial court's ruling on their exceptions of no cause of action. We also affirm the trial court's judgment on the issue of sanctions. We deny the defendants' request for frivolous appeal damages.

FACTS
This suit indirectly arises from two cases filed in the Fourth Judicial District, No. 88-0978, Gulf States Land & Development, Inc., et al. v. Ouachita National Bank in Monroe, [consolidated with two other cases] 612 So.2d 1031 (La.App.2d Cir.1993), writ denied, 618 So.2d 406 (La.1993), reconsideration denied, 619 So.2d 540 (La.1993); and No. 91-05988, Joyner v. Premier Bank, et al. The former case involved Stanley Palowsky, a business associate of Dr. Joyner. In the latter case, Dr. Joyner and his former wife Nancy Joyner were the plaintiffs. In both of these cases, George M. Wear, Jr., represented Premier Bank, and Joseph D. Cascio, Jr., represented Don Kneipp. During the proceedings of these cases, the deposition of Dr. Joyner's girl friend, Deborah Albritton, was taken on four occasions: October 23, 1990; July 8, 1992, while she was in jail serving the unsuspended portion of her sentence for conspiracy to distribute cocaine; July 31, 1992, the day she was released from jail; and July 5, 1993, less than a month before the present suit was filed.
The present suit was filed by Dr. Joyner on July 28, 1993. Named as defendants were Mr. Wear and his law firm of Shotwell, Brown & Sperry and Mr. Cascio and his law firm of Hayes, Harkey, Smith, Cascio & Mullens. In his original and amended petitions, Dr. Joyner alleged that: (1) the attorneys defamed him by telling Ms. Albritton that he had caused her to become addicted to drugs; (2) the attorneys told Ms. Albritton not to disclose during a deposition that she had given them the so-called "X" document (which made it appear Dr. Joyner had taken drugs with her) and they suborned perjury when she told opposing counsel that she had not given them any documents; (3) during the trial of the Gulf States case, Mr. Cascio suborned perjury when his client Don Kneipp testified that Dr. Joyner hired Maurice Pearson to prepare a scandalous report on Stanley Palowsky when Mr. Cascio supposedly knew that Mr. Kneipp had hired Pearson; and (4) Mr. Cascio and Mr. Wear somehow precipitated or aided in investigations of Dr. Joyner by the FBI and the Louisiana Board of Medical Examiners.
The defendants filed exceptions of no cause of action, motions to dismiss, and, alternatively, motions for summary judgment. The trial court granted all of these exceptions and motions, dismissing the plaintiff's law suit at his cost.
Thereafter, the defendants sought sanctions against Dr. Joyner and his attorney, Robert Matthews, under LSA-C.C.P. Art. 863. The trial court found that sanctions were warranted. Dr. Joyner and Mr. Matthews were each ordered to pay $5,000 to Mr. Cascio and his firm and $5,000 to Mr. Wear and his firm.
Dr. Joyner appeals the dismissal of his suit. He and Mr. Matthews both appeal the imposition of sanctions. The defendants answered the appeal; they seek an increase in the sanction awards, as well as frivolous appeal damages.

DISMISSAL OF SUIT
Dr. Joyner contends that the trial court erred in dismissing his suit. We note that the trial court granted both the exceptions of no cause of action and the motions for summary judgment; as we resolve the matters before us on the motions for summary judgment, we pretermit consideration of the exceptions of no cause of action.

Defamation
A motion for summary judgment shall be granted when the mover establishes that *638 there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. LSA-C.C.P. Art. 966. The decision is made on the basis of the pleadings, affidavits and discovery documents in the record. LSA-C.C.P. Art. 966; Sassone v. Elder, 626 So.2d 345 (La.1993).
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991).
In cases affecting the exercise of First Amendment liberties, proper summary judgment practice is essential. Summary adjudication may be thought of as a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech and press. Mashburn v. Collin, 355 So.2d 879 (La.1977). Thus, in order to survive a motion for summary judgment, a defamation plaintiff must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial. Without such evidence, there is no genuine issue of material fact, and summary judgment should be granted. Sassone v. Elder, supra.
In order to prevail in a case of defamation under the Louisiana law, the plaintiff must prove five elements: (1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resultant injury. Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196 (La.1980).
A defamatory communication is one that tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is one for the court. That question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense. [Citations omitted.] Sassone, supra. Accusations of criminal conduct are defamatory per se. Cangelosi, supra.
The basis of Dr. Joyner's defamation complaint is that Mr. Wear and Mr. Cascio allegedly told Ms. Albritton that he had gotten her "hooked on" or addicted to drugs. In support of this assertion, Dr. Joyner relies upon the following statements in Ms. Albritton's July 1993 deposition:
Q. Did Mr. Wear and Mr. Cascio tell you what it was, that you should sue Lee Roy Joyner for, or why you should sue Lee Roy Joyner?
A. For getting me hooked on drugs, which led to me being busted. [p. 48, lines 21-25]
* * * * * *
A.... And of course, they [Cascio and Wear] were still telling me what a horrible person Lee Roy was, for getting me hooked on drugs.... [p. 63, line 25 through p. 64, line 2]
During the same deposition, the following exchange occurred when Ms. Albritton was directly asked if the two attorneys had told her that Dr. Joyner had gotten her addicted to drugs:
Q. Did either Mr. Cascio or Mr. Wear suggest to you that Lee Roy Joiner [sic] had gotten you hooked on prescription drugs?
A. They told me that they had gone to a doctor, some doctor, and that all the prescriptions that I had given them, and that the doctor told them that if I had taken all those drugs, that it was a miracle that I was living. [p. 45, lines 1-8]
This falls far short of proving that Mr. Cascio and Mr. Wear spoke the alleged defamatory words, particularly in light of other statements made by Ms. Albritton that it was another person, Maurice Pearson, who convinced her that Dr. Joyner had caused her to become addicted to drugs and that Pearson then repeated that belief to other persons. In her July 1993 deposition, she gave the following testimony:

*639 Q. Did you say that Mr. Pearson had suggested to you, that Lee Roy had gotten you hooked on drugs?
A. Well, he told several people, as a matter of fact, I mean, he would make excuses for me, for shaking, because it is one of the after-effects of Lithium is the shakes.
But I didn'tI was too embarrassed about going to a mental hospital, so I didn't really tell anybody that, you know, that I had been there. So he just took it that Lee Roy was prescribing me medicine and in fact we weren't even speaking, and he told everybody. [p. 44, lines 9-20]

* * * * * *
Attached as an exhibit to the July 1993 deposition was a copy of Ms. Albritton's interview with a newspaper reporter which contained the following statement:
I had the shakes real bad after I got out of the hospital. The doctor had diagnosed me being manic-depressive and was giving me some pills. Pearson was saying I needed to get off these pills. "You don't need those. Lee Roy has got you totally messed up." I was embarrassed about going to the hospital and he just assumed Lee Roy was giving me the pills, actually it was the psychiatrist that gave them to me. He kept telling me I was hooked on them and needed to get off them.
He pretty much convinced me Lee Roy had gotten me hooked on drugs. And at that time Lee Roy and I were at such odds, it made me feel good if people didn't like him. Then ... [illegible] started telling people Lee Roy had gotten me hooked on drugs.
Our review of the record convinces us that Dr. Joyner, as a defamation plaintiff, has failed to produce evidence of sufficient quality and quantity to demonstrate that he would likely be able to meet his burden of proof at trial. The evidence submitted on the motions for summary judgment does not even show that Mr. Cascio and Mr. Wear spoke defamatory words directed at Dr. Joyner. The statements show only that Ms. Albritton used drugs. They do not indicate that the drugs were illegal. Nor do they suggest any criminal activity by Dr. Joyner. Some individuals become addicted to medication through no fault of the prescribing physician.
Therefore, we find that summary judgment in favor of the defendants was properly granted on the defamation issue.

Ethical Violation
Dr. Joyner also contends that the trial court erred in dismissing his claims of ethical violations. Specifically, these alleged ethical violations were instructing Ms. Albritton to withhold the "X" document, suborning Ms. Albritton's perjury as to the existence of the "X" document during her July 8, 1992 deposition in the Gulf States suit, suborning perjury by Don Kneipp in the Gulf States trial, and causing Dr. Joyner to be investigated by the FBI and the Louisiana Board of Medical Examiners.
Law
An attorney does not owe a legal duty to his client's adversary when acting in his client's behalf, absent a showing of intentionally tortious conduct on the attorney's part, such as knowingly violating a prohibitory law. Penalber v. Blount, 550 So.2d 577 (La. 1989); Crockett v, Crockett, 612 So.2d 89 (La.1993). A non-client, therefore, cannot hold his adversary's attorney personally liable for either malpractice or negligent breach of a professional obligation. The intent of this rule is not to reduce an attorney's responsibility for his or her work, but rather to prevent a chilling effect on the adversarial practice of law and to prevent a division of loyalty owed to a client. Penalber, supra; Montalvo v. Sondes, 93-2813 (La. 5/23/94), 637 So.2d 127.

The "X" Document
The "X" document is a sheet from a prescription pad which contained the following note from Ms. Albritton to Dr. Joyner: "The X will be used by you and me or by no one! The extras are at my house." In her July 1993 deposition, Ms. Albritton testified that she gave Mr. Wear and Mr. Cascio a copy of this document before her deposition in the Gulf States case on July 8, 1992, and *640 told them that it showed that Dr. Joyner took drugs with her because the "X" referred to the drug Ecstacy. She further contended that the lawyers instructed her to conceal the existence of this document from counsel for Mr. Palowsky and, following her compliance with their instructions, praised her for perjuring herself. However, in her July 1993 deposition, Ms. Albritton admitted she altered the document and that it did not refer to any drug usage but to a sex toy she and Dr. Joyner used.
Under Penalber and its progeny, a cause of action may be stated against an attorney by a non-client adversary for intentional tortious conduct. However, the conduct of which Dr. Joyner complains arose in connection with a deposition in the Gulf States litigation of Mr. Palowsky, a case in which Dr. Joyner was not even a party. Nor was he a third-party beneficiary of the attorney's actions.[1] Instead, he was a non-client, nonadversary. As such, he was not entitled to bring a Penalber action under the facts presented in this case.
Therefore, as a matter of law, the defendants are entitled to summary judgment on this issue.[2]

Kneipp's testimony
In the Gulf States law suit, Mr. Palowsky contended that a bank officer extorted him into signing a loan agreement by threatening to reveal scandalous information uncovered by Maurice Pearson, a private investigator. There was a question as to whether Mr. Pearson was hired by the bank or by Dr. Joyner, who had business dealings with Mr. Palowsky. Mr. Kneipp, the bank closing attorney, testified at the August 1992 trial of the Gulf States case that the report was requested by Dr. Joyner. In a deposition, Mr. Pearson testified that this testimony was untrue and that he had informed Mr. Cascio, Mr. Kneipp's attorney, of his version of the facts before trial. Therefore, Dr. Joyner now contends that Mr. Cascio suborned perjury because he believed his own client, instead of Mr. Pearson. However, we note that in her July 8, 1992 deposition (one month before the Gulf States trial), Ms. Albritton testified that the bank had nothing to do with the report on Mr. Palowsky. Even in her July 1993 deposition, she reaffirmed telling Mr. Cascio that the bank did not know about the report.
The evidence submitted on the motions for summary judgment shows, at most, that an attorney who was presented with conflicting evidence chose to believe his client. Under the circumstances presented here, this cannot be even remotely considered subornation of perjury. As a matter of law, the defendants are entitled to summary judgment on this issue.

Investigations
The defendants presented affidavits from the FBI and the Board of Medical Examiners that established that the defendants were not responsible for their respective investigations of Dr. Joyner. These affidavits were not contradicted; therefore, summary judgment on this issue was proper.

SANCTIONS
Dr. Joyner and his attorney, Mr. Matthews, appeal from the trial court's imposition of sanctions. They contend that, under LSA-C.C.P. Art. 863, the trial court should have applied the standard of "clear and convincing evidence," instead of "preponderance of the evidence." They also argue the amount of the sanctions was excessive. The defendants answered the appeal, seeking an increase in the sanctions.

Standard of Proof
Dr. Joyner and Mr. Matthews argue that the trial court should have applied the standard of "clear and convincing" evidence. This is particularly important because the *641 trial court found that the defendants proved by a preponderance of the evidence that Dr. Joyner and Mr. Matthews failed to make a reasonable factual inquiry before filing the original and amended petitions and that they were not well grounded in fact. However, the trial court further concluded the issue was sufficiently close that application of the "clear and convincing" standard would lead to a different result in this case.
Although Dr. Joyner and Mr. Matthews argue that the standard should be "clear and convincing," they acknowledge that there are no Louisiana cases supporting this position. They further concede that even the federal cases applying FRCP Rule 11, the source of LSA-C.C.P. Art. 863, do not expressly state the standard of proof.
We find that there is no basis for applying the standard of "clear and convincing" evidence to establish the availability of sanctions under LSA-C.C.P. Art. 863. The trial court did not err in applying the standard of "preponderance of the evidence."

LSA-C.C.P. Article 863
In order to impose sanctions, a trial court must first find that one of the affirmative duties imposed by LSA-C.C.P. Art. 863(B) has been violated: the attorney must certify that he has read the pleading; that to the best of the attorney's knowledge, information and belief formed after reasonable inquiry, the pleading is well-grounded in fact; that the pleading is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law; and that the pleading is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. Morehouse Parish Hospital Service District v. Pettit, 25396 (La. App.2d Cir. 1/19/94), 630 So.2d 1338, writ denied, 94-0449 (La. 4/7/94), 635 So.2d 1135.
Thus, the obligation imposed upon litigants and their counsel who sign a pleading is to make an objectively reasonable inquiry into the facts and the law. Subjective good faith will not satisfy the duty of reasonable inquiry. Diesel Driving Academy, Inc. v. Ferrier, 563 So.2d 898 (La.App.2d Cir. 1990); Penton v. Clarkson, 93-0657 (La.App. 1 Cir. 3/11/94), 633 So.2d 918.
Among the factors to be considered in determining whether reasonable factual inquiry has been made are: (1) the time available to the signer for investigation; (2) the extent of the attorney's reliance on his client for the factual support for the document; (3) the feasibility of a prefiling investigation; (4) whether the signing attorney accepted the case from another member of the bar or forwarding attorney; (5) the complexity of the factual and legal issues; and (6) the extent to which development of the factual circumstances underlying the claim requires discovery. Diesel Driving Academy, Inc., supra.
When examining a sanctions award, the court of appeal will review the trial court's factual determination that LSA-C.C.P. Article 863 has been violated under the manifest error or clearly wrong standard of review. The determination of the type and amount of the sanction is reviewed under the abuse of discretion standard of review. Matter of Succession of Thomas, 602 So.2d 1108 (La.App. 1st Cir.1992); Morehouse Parish Hospital Service District v. Pettit, supra.

Failure to Make Reasonable Factual Inquiry
In the instant case, the trial court found that the plaintiff's claims against the defendant attorneys were not well-grounded in fact, a finding based upon Dr. Joyner's and Mr. Matthews' unreasonable reliance upon the testimony of Ms. Albritton. We cannot say that the trial court's determination that there was no basis in fact for the claims against the defendants is clearly wrong.
The record demonstrates that Ms. Albritton was a manic-depressive, spurned girl friend with drug problems and criminal convictions for battery, conspiracy to distribute cocaine and lying under oath who changed her testimony with each of her four depositions. She was willing to give false testimony or to change her testimony in exchange for compensation or for revenge. At one point, Dr. Joyner accused her of trying to extort money from him for favorable testimony, *642 threatening him and his new girl friend, and trying to hire a hit man to kill him. Around the time the present suit was filed, she entered into what the trial court characterized as a "rather enigmatic" financial relationship with Dr. Joyner whereby he gave her $12,000 for used "exercise equipment" and agreed to make "payments" on an "as needed" basis to cover bills submitted by Ms. Albritton's sister. Although Mr. Matthews testified that he did not learn about this financial arrangement until February 1994, the trial court correctly observed that he could have discovered it prior to filing either the original petition or the amended petition had he made a reasonable investigation of Ms. Albritton's change in testimony.
By their own admissions, Dr. Joyner and Mr. Matthews were only too aware of Ms. Albritton's total lack of credibility. In his June 24, 1992 deposition, Dr. Joyner was asked about his former girl friend's reliability:
Q. In your opinion, is Debbie Albritton a credible witness?
A. Absolutely not. [p. 64, lines 14-16]
During Dr. Joyner's July 9, 1992 deposition, Mr. Matthews made the following observation on the record:
But, I mean, some of this Deborah Albritton stuff is getting out of hand. I don't think anybody is going to come in and vouch for her credibility, or if they try to use her as a witness, they're going to be cutting off their necks. So, I mean, everybody is wasting their time with her and all of these questions. No attorney in their right mind would use her as a witness. [Emphasis added.] [p. 113, lines 15-21]
Based on the foregoing, we find no manifest error in the trial court's ruling that sanctions were warranted.

Amount of Sanctions
Once a court determines that a violation of LSA-C.C.P. Art. 863 has occurred, it has considerable discretion as to the type and severity of sanctions to be imposed. Borne v. New Orleans Health Care, Inc., 616 So.2d 236 (La.App. 4th Cir.1993), writ denied, 623 So.2d 1332 (La.1993).
LSA-C.C.P. Art. 863 authorizes an award of "reasonable" and not necessarily actual attorney fees. The goal to be served by imposing sanctions is not wholesale fee shifting, but correction of litigation abuse. Diesel Driving Academy, Inc., supra.
In selecting an appropriate sanction, the trial court considered that each of the two defendant law firms paid $10,000 in attorney fees while their malpractice insurers paid the rest. We find no abuse of the trial court's much discretion. Therefore, we affirm the amount of sanctions as set forth by the trial court.

FRIVOLOUS APPEAL
In their answer to the appeal, the defendants seek damages for frivolous appeal under LSA-C.C.P. Art. 2164. This provision is penal in nature and must be strictly construed. Prieto v. St. Tammany Homesites, Inc., 602 So.2d 1111 (La.App. 1st Cir.1992). An appeal will be deemed frivolous if it does not present a substantial legal question, or if it is obvious either that its sole purpose is delay or that appealing counsel does not seriously believe the view of the law which he advocates. Guy v. Madison Parish School Board, 579 So.2d 1108 (La.App.2d Cir.1991).
Any doubt regarding the frivolous nature of an appeal must be resolved in favor of the appellant. Antis v. Miller, 613 So.2d 1034 (La.App. 3 Cir.1993). Appeals are favored, and damages for frivolous appeal will not be awarded unless it appears that the appeal was taken solely for the purpose of delay or that the appealing counsel does not seriously believe in the position he advocates. Prieto, supra.
We do not find that the appeal was taken solely for delay. Furthermore, we are unable to conclude that counsel for the appellants did not genuinely advocate the merits of this appeal. Therefore, we decline to award damages for frivolous appeal in this case.

CONCLUSION
The trial court judgment granting the defendants' motions for summary judgment and *643 dismissing the plaintiff's suit is affirmed. The trial court judgment on the issue of sanctions is likewise affirmed.
The defendants' request for frivolous appeal damages is denied.
Costs of this appeal are assessed against Dr. Joyner and Mr. Matthews.
TRIAL COURT JUDGMENTS AFFIRMED. FRIVOLOUS APPEAL DAMAGES DENIED.
BROWN, J., concurs.
NOTES
[1] See footnote 2 of the Penalber case, in which the Supreme Court specified that opinion did not address the situation where the non-client was not an adversary but a third-part beneficiary of the attorney's actions. In such a case, only a negligence standard is required.
[2] Although we find it unnecessary to rule upon this issue, we also have reservations as to whether, in his petition or amended petition, Dr. Joyner adequately alleged harm as a result of this nondisclosure of an altered document produced by a questionable witness which accused him of criminal activity.