## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 1998-CT-01520-SCT

*HAROLD SPEED*

*v.*

*ROBERT E. SCOTT*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 08/07/1998 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WALTER WILLIAM DUKES |
| ATTORNEY FOR APPELLEE: | T. MACK BRABHAM |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 04/26/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/17/2001 |

### EN BANC.

### PITTMAN, CHIEF JUSTICE, FOR THE COURT:

¶1. Presiding Judge Leslie H. Southwick of the Court of Appeals has written an extensive and well-researched opinion which we hereby largely incorporate as the opinion of this Court.

¶2. Robert E. Scott was called a "liar and thief" by Harold Speed. The assertions occurred over a thirty-day period at four meetings of the volunteer fire department in which both men served. Scott brought suit, though he took the position throughout that no one believed Speed and that Scott's reputation was undamaged. A jury awarded Scott $50,000 in actual and punitive damages, and judgment was entered accordingly. On appeal a divided Court of Appeals agreed with Speed's argument that the absence of evidence of damage to reputation was fatal to Scott's suit, and it reversed and rendered judgment for Speed. We granted certiorari and now affirm the Court of Appeals.

### FACTS

¶3. Harold Speed has served as chief of the Smyrna Volunteer Fire Department since it was formed in 1989. Robert Scott moved to Copiah County in 1992 and built a home about four miles from the Smyrna fire station. The two men became friends at that time. Chief Speed invited the newcomer to become a volunteer with the fire department, and Scott did so.

¶4. One dispute that arose between the two men in 1997 centered on the fire department's share of

insurance rebate money. Apparently this is the money paid to the State Tax Commission annually as a tax on insurance premiums, by them distributed to counties, and then allocated by boards of supervisors. Miss. Code Ann. §§ 83-1-37 & -39 (1999). Chief Speed, Scott, and other Smyrna firemen believed that more of the money should be made available by the county for the volunteer fire departments. In March 1997 Smyrna firemen voted to seek publication of a letter on the subject in the county newspaper. Scott prepared it.

¶5. Speed at some stage became less enamored with that idea, testifying at trial that he feared that publishing the letter would harm the fire department's relations with the board of supervisors. At a meeting on May 18, Chief Speed and Scott informed the other firemen about a conversation that they both had with the president of the board of supervisors. Speed said that the president had warned them that the fire department should not be overly combative about the money. Scott on the other hand stated that the president told them to do whatever they thought was necessary. At that meeting, Chief Speed said that Scott was lying about what they had been told. A vote was taken, by which it was decided not to authorize publication. Some members objected to the propriety of the vote and abstained. Scott also argues that the vote was invalid, though whether fire department procedural rules were bent or broken has no importance to our issues.

¶6. In the local May 21 newspaper, the letter was published as an article by Scott. It stated that the Smyrna fire department had voted in favor of the distribution of funds that was suggested in Scott's article. Speed testified that he asked Scott why it was published despite the May 18 vote and was told that it was too late after the vote to withdraw it. Speed did not believe the assertion as he said that someone else had assured him that it was not too late to halt publication. At two meetings in June, Speed said to other firemen that Scott was lying about the publication issue.

¶7. While animosity was growing over the letter, Chief Speed and Scott became antagonists over a different matter. Chief Speed had earlier placed Scott in charge of an important training program that could favorably affect the department's evaluation by the State Fire Rating Board. Since the department served rural areas, connecting a hose to a fire hydrant was often impossible. The program on which Scott worked was to assure delivery of water from such sources as natural reservoirs. Information needed to be acquired on the location of these water sources. An exhibit was introduced at trial that apparently was the principal document in question. It was a two-page hand-written list containing notations made by Scott when he, Chief Speed, and another man took measurements one day in the field on the distances from ponds or other reservoirs to the closest location where the tanker could be maneuvered during a fire at any one of about thirty sites. The measurements were of distances of 50 feet to 300 feet to a reservoir.

¶8. Scott also prepared a loose-leaf booklet or binder that would contain this information. There is no evidence that the booklet contained anything beyond the list of locations of reservoirs and measurements. The description of the booklets in the minutes of a fire department meeting said that they contain "the addresses of all locations and the field site to be used by each location. [Scott] will make a book listing each field site and the length of blue line needed at each site." That is exactly the information that is on the two-page hand-written list of measurements. Scott agreed with the minutes other than that he only prepared one booklet, not one for each vehicle. He apparently placed clear plastic sheets into one binder and slipped the two pages with measurements between the sheets.

¶9. Scott testified that Chief Speed at the meetings of firemen that were held on May 29, June 3 and June

17, called him a "thief" for keeping these materials and not giving them to the fire department. Speed did not remember using the word "thief," but said that he told the others that Scott had taken papers that did not belong to him. He said that Scott told him that "you're going to have to do it all over again. I'm going to take it with me." Speed acknowledged at least using the word "thief" when speaking privately to a couple who had attended one of the meetings.

¶10. Scott summarized the evidence that he presented this way:

1) May 18, 1997, Speed suggested Scott was lying at a meeting of firemen.

2) May 29, 1997, Speed called Scott a "thief" at a meeting.

3) June 3, 1997, Speed called a "liar and thief" at a meeting.

4) June 17, 1997, Speed repeated the phrase at a firemen's meeting.

5) June 17, 1997, Speed used the "liar and thief" phrase at the house of a married couple who had attended the fire department meeting earlier that day.

¶11. On June 26, 1997, Scott sued Speed in the Copiah County Circuit Court for slander and also for intentional infliction of emotional distress. He labeled the latter as "outrageous conduct" but acknowledges it is the same tort.[1] He sought actual and punitive damages. At trial Scott testified that the time between the incidents and the trial were "the worst fourteen months of my life." He says the allegation of lying and stealing the papers had "bothered him enormously," that he was shocked, mad, and felt insulted. He then talked about the value that he put on his reputation. He testified, "I don't sleep, I can't get it off my mind." He testified about no other damages. Scott also felt confident that no one believed that he was a liar or a thief, saying, "I don't know one" person who believed what Speed had stated.

¶12. Scott's wife also testified. She stated that Scott was not the same person. He had lost his sense of humor, was not as supportive of her emotionally, and was often up at night because he could not sleep. She used the phrase "I know I don't have my husband anymore. The man that I had a year and a half ago I don't have. . . ."

¶13. No evidence was offered indicating harm to Scott's reputation, effect on his livelihood, or any other monetary damage from the statements.

¶14. After deliberations, the jury returned a verdict that awarded Scott $40,000 in compensatory damages and $10,000 in punitive. Judgment for those amounts was then entered.

## DISCUSSION

¶15. Speed raises three issues. The first concerns the fact that Scott's attorney at trial asked Speed two allegedly inflammatory questions, persisting in the inquiry even after an objection to the first question was sustained. We find no reversible error in that. Because of our ruling on the two issues relating to the evidence in this case, we only identify this first issue and then proceed beyond it. The remaining two issues we consider together.

*Issue I: Evidence to support $40,000 in actual damages and $10,000 in punitive damages*

¶16. The parties agree on appeal that Scott's cause of action is either for intentional infliction of emotional distress or for defamation. Speed argues that no award of actual or at least punitive damages could be made under either theory.

¶17. The tort of intentional infliction of emotional distress can be dispensed with rather quickly as an arguable basis in this suit. To justify a finding that this tort has occurred, the defendant's conduct must be "wanton and wilful and it would evoke outrage or revulsion." *Leaf River Forest Prods., Inc. v. Ferguson,* 662 So. 2d 648, 659 (Miss. 1995). Among the kind of actions that have been found to evoke such outrage were a plot by a girlfriend and her parents to hide the child of an unwed father, arranging for the baby to be adopted by strangers while the father pursued a custody suit. *Smith v. Malouf*, 722 So. 2d 490, 498 (Miss. 1998). In another suit a car dealership forged a customer's name on a sales contract and sold the contract to a finance company, resulting in the customer's credit being damaged. *T. G. Blackwell Chevrolet Co. v. Eshee*, 261 So. 2d 481, 486 (Miss. 1972).

¶18. Contrarily, what is not sufficient have been such actions as a law firm breaching an employment contract with an attorney, locking him out, refusing him secretarial support and dropping his name from the firm sign. *Fuselier, Ott & McKee, P.A. v. Moeller*, 507 So. 2d 63, 69 (Miss. 1987). A Mississippi federal court defined the necessary severity as acts "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Pegues v. Emerson Elec. Co*., 913 F. Supp. 976, 982 (N.D. Miss.1996) (quoting Restatement (Second) of Torts § 46 cmt. d. (1965)). Such acts did not occur here.

¶19. As one court summarized the jurisprudence in this area, "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Jenkins v. City of Grenada,* 813 F. Supp. 443, 446 (N.D. Miss. 1993).

¶20. Some of Scott's witnesses testified that Chief Speed saw Scott as a potential rival and may have been trying to undermine him. That possible ulterior motive plus strong feelings and perhaps hot temper propelled Speed into his charges over the thirty-day period. We cannot find in these actions such conduct as would cause an observer of ordinary sensibilities to suffer "outrage or revulsion." Such emotions are not the initial or early severity of displeasure that we may have in the actions of our fellow citizens, but are perhaps the most extreme. Speed's conduct was over a fairly short period of time, arose from the disagreements between the two men and perhaps fears about Speed's career longevity. Scott's own proof indicates that the assertions were not considered credible. The alleged lying concerned what a newspaper publisher may have said about the ability to stop publication, or a president of the board of supervisors may have said about the right course for the fire department to take. The thievery alleged was of some hand-written papers prepared for a training program. Speed's conduct simply cannot be seen as intolerable, outrageous or revolting.

¶21. This leaves the general tort of defamation. Defamation is "that which tends to injure reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." Prosser & Keeton on the Law of Torts § 111, at 771 (5th ed. 1984). The usual analytical division is into the twin torts of libel for written defamations and slander for oral ones. *Id*. This was slander. What is needed in Mississippi to prove the tort are the following:

    (a) a false statement that has the capacity to injure the plaintiff's reputation;

(b) an unprivileged publication, i.e., communication to a third party;

(c) negligence or greater fault on part of publisher; and

(d) "either actionability of statement irrespective of special harm or existence of special harm caused by publication."

*Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998). The meaning of "special harm" in the last element will be discussed presently.

¶22. By the time of trial Chief Speed stipulated that Scott was neither a liar nor a thief, but Speed did not concede that he knew the statements to be false when made in May and June 1997. The trial court found that Scott was a vortex public figure. A vortex public figure is a person "who is otherwise a private citizen but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest." *Eason v. Federal Broad. Co.*, 697 So. 2d 435, 438 (Miss. 1997) (quoting *Ferguson v. Watkins,* 448 So. 2d 271, 277 (Miss. 1984)). This is standard First Amendment law and therefore a required consideration. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). On appeal neither party challenges the vortex figure designation.

¶23. If a person is deemed a vortex public figure and the alleged defamation concerns a matter of public interest, the plaintiff must prove that the defendant acted with actual malice. *Ferguson,* 448 So. 2d at 278. By "actual malice," it is meant that Chief Speed must have made the comments either knowing them to be false or in reckless disregard of their truth. *Franklin*, 722 So. 2d at 692.

¶24. Scott was resolute that no harm to his reputation occurred. No evidence of damage to reputation was offered. His attorney informed the court that no instructions on damage to reputation were offered. Sleeplessness, anger, and profound irritation about the statements were shown. Therefore, even though it is uncontested that the statements were "published" to third parties and even if there were jury issues on the knowing falsity and defamatory capacity of the statements, that leaves the issue of whether adequate proof of damage was introduced. As this Court observed, "no person avoids a few linguistic slings and arrows, many demonstrably unfair. . . . Still our sensitivity to the destructive power of words hardly suggests that we assess damages for all bruised feelings." *Ferguson*, 448 So. 2d at 276.

¶25. Slander requires proof of "special harm" unless the statements were actionable per se. *E.g., Franklin,* 722 So. 2d at 692. Discussed below are slanders that are actionable per se and need no special harm. However, when special harm must be shown, this is required:

All other slanderous words, no matter how grossly defamatory or insulting they may be, . . . are actionable only upon proof of "special" damages -- special in the sense that it must be supported by specific proof, as distinct from the damage assumed to follow in the case of libel or of the kinds of slander [that are actionable per se].

Prosser, Torts, § 112, at 793. "Special harm . . is the loss of something having economic or pecuniary value. . . . The limitation [that arose centuries ago] has persisted in the requirement that special harm, to serve as the foundation of an action for slander that is not actionable *per se*, must be 'temporal, 'material,' pecuniary or economic in character." Restatement of Torts (Second) § 575, cmt. b. However, once it is shown that special harm resulted from a slander that was not actionable per se, recovery may then also be

had for emotional distress and resulting bodily harm. *Id.* § 575 cmt. c.; *see also id*. § 623, cmt. a. ("neither emotional distress nor bodily harm resulting from it is special harm sufficient to support an action for a slander that is not actionable *per se*.").

¶26. These rules may at first blush seem artificial, but their purpose is obvious enough. Slander is an unusual tort, where mere spoken words become actionable. Everyday life contains risks of sharp words and wounded feelings, but also worse. Brought forward from common law origins is a balancing of the competing interests of one person to speak and another to be free from harm. Part of the balance struck is to require concrete harm before spoken words are actionable. Scott's concession that he had no pecuniary damages but was only seeking loss for mental distress means that no special harm was even alleged, much less proven.

¶27. What is left for Scott was to prove that these words fit within one of the five categories of slander identified in Mississippi for which no special harm need be shown:

> "1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment. (2) Words imputing the existence of some contagious disease. (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof. (4) Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business;" and in this and some other jurisdictions [5] words imputing to a female a want of chastity.

*W. T. Farley, Inc. v. Bufkin,* 159 Miss. 350, 132 So. 86, 87 (1931).[(2)] Only the third somewhat problematic category of *Farley* does not appear in a similar listing in the *Restatement*. Restatement of Torts (Second) § 570. The chastity category was adopted by this Court only two years prior to *Farley*, after this Court admitted that falsely claiming that a woman was unchaste was not actionable at common law without proof of special damages. *Interstate Co. v. Garnett,* 154 Miss. 325, 342-47, 122 So. 373, 376-78 (1929). The addition was made because these rules must be "adapted to our institutions and circumstances. . . ." *Id.* at 347, 122 So. at 378.

¶28. The only category that Scott argued was applicable was the one for allegation of a crime. When Chief Speed accused him of being a "thief" for taking papers regarding the firemen's training program, Scott says that this implied that he committed a criminal act.

¶29. The law is settled that the mere use of the label "thief" is insufficient. It is at this point that the majority and the dissents in the present case diverge. We note that the pre-eminent torts authority limits the actionable per se doctrine by concluding "that it is not always the crime, but rather the character of the act charged, which will be determinative. It is not every trivial assault or battery which involves 'moral turpitude, ' but an accusation that the plaintiff beat his mother necessarily does." Prosser & Keeton, Torts, § 112, at 789. Similarly, every accusation of "theft" does not rise to the required level. One of the earliest Mississippi authorities that discussed these issues held that accusing someone of theft, when the act could not be "a felonious stealing," is not actionable per se. *Cock v. Weatherby*, 13 Miss. (5 S. & M.) 333, 337 (1845). *Farley* recognized exactly that by defining the first category of actionable per se slanders as only those charging a "criminal offense involving moral turpitude and infamous punishment."

¶30. No matter the criminal label, the charge must be a significant one:

One who publishes a slander that imputes to another conduct constituting a criminal offense is subject to liability to the other without proof of special harm if the offense imputed is of a type which, if committed in the place of publication, would be

(a) punishable by imprisonment in a state or federal institution, or

(b) regarded by public opinion as involving moral turpitude.

Restatement of Torts (Second) § 571.

¶31. In other words, the mere possibility that an act could be penalized under a criminal code is not enough. Falsely accusing someone of exceeding a highway speed limit is an example of an accusation of a crime that is not actionable per se. Only when the crime falsely imputed is of "major and serious a character . . . is [it] actionable without proof of special damage." *Id.* cmt. f. "This is not true of crimes punishable by imprisonment in the county jail or in a workhouse or other similar institution. Many petty misdemeanors, not regarded in the eyes of the community as highly disgraceful, are made punishable by imprisonment . . . . Unless these crimes are regarded, under Clause [§571](b), as involving moral turpitude, the accusation of their commission is not actionable *per se.*"*Id.* "Moral turpitude has been defined as inherent baseness or vileness of principle in the human heart. It means, in general, shameful wickedness, so extreme a departure from ordinary standards of honesty, good morals, justice or ethics as to be shocking to the moral sense of the community." *Id.* cmt. g. Claiming that this volunteer fireman took two notebook pad pages that he himself had written upon simply does not rise to a crime of shameful wickedness and extreme departure from community standards.

¶32. These considerations are recognized in Mississippi slander law. Prior to **Farley's** designation of five categories of actionable per se slanders, Chief Justice Sydney Smith had discussed one of them in an appeal of damages awarded for a false charge that another person had taken property. The defendant's accusation was that after another person's death, the accuser "did not find in the [deceased's] house everything that was inventoried, and that Mrs. Pizatti, meaning the plaintiff, had taken property that did not belong to her out of the house," all of which implied that Pizatti was a thief. **Woodville v. Pizatti**, 119 Miss. 85, 80 So. 491 (1919). One person who heard the statement specifically recalled that the defendant had said that Pizatti "had taken part [of the property] away" that should have been in the house. **Id.**, 80 So. at 492.

¶33. Pizatti argued that these words were "actionable *per se* under the common law, for the reason that they charge her with the commission of a crime." **Id.** The Court agreed that allegations of a crime are actionable per se, "but only such as charge him with the commission of an act which, if true, would subject him to punishment-- 'for a crime involving moral turpitude, or would make him liable to a punishment infamous in character, or to one which, if not necessarily infamous, would bring disgrace upon him.' 17 R. C. L. 265." **Id.**

¶34. Even if a crime had been alleged, which the Court doubted, it was not a crime of moral turpitude or one involving punishment infamous or disgraceful in character. Therefore, a peremptory instruction for the defendant should have been given. **Id.**

¶35. Though larceny can be a serious charge, we find that the allegation made by Chief Speed was not of that level of theft. Scott's possible taking of two hand-written pages of notebook paper was not an offense

of moral turpitude, or a crime leading to punishment infamous or disgraceful. Though the firemen who heard the statements may not have thought in terms of misdemeanor and felony, county jail or state prison, or even that the unauthorized taking of these pages may not have been a crime at all, it is obvious that the alleged theft was of documents of no intrinsic monetary value. There was nothing arduous about the means of reacquiring the information. Remeasurements would have inconvenienced the volunteer fire department. However, there was no possibility shown by these words that Scott would have suffered meaningful criminal liability from the theft.

¶36. Finally, to the extent Scott's lying about what he had been told by others needs to be analyzed under these rules, it is enough to say that even if Scott lied to the assembled firemen at a meeting, not in a court setting or otherwise under oath, that would not be a crime.

¶37. One relatively recent decision by this Court discussed this issue. Immediately prior to citing *Pizatti* for a different principle, this Court stated that "an utterance falsely imputing a crime or accusing one of being a thief is actionable *per se." **Baugh v. Baugh**,* 512 So.2d 1283, 1285 (Miss. 1987). The relevant phrase is that "an utterance falsely [1] imputing a crime or [2] accusing one of being a thief is actionable *per se." **Id.*** at 1285 (brackets added). **Baugh** literally provides that the imputation of any crime at all is actionable per se.

¶38. Secondly, even though the Court did not discuss the standard limitations on these rules, the distinctions were irrelevant to the case. In fact, even without the distinctions the Court found that an allegation that could have been interpreted to mean that the plaintiff had engaged in fraud to obtain Social Security benefits was not "a clear and unmistakable accusation" that a crime had occurred. *Id.* Thus **Baugh** understandably did not delve into the intricacies of what was not relevant to its decision. Important to our view is that **Baugh** cited and in no way criticized **Pizatti**, the case that made these distinctions clear. We find that neither part of the quoted sentence from **Baugh** should be read outside of the long-standing elaborations on the doctrine.

¶39. There are cases in which the word "thief" was used and found to be actionable per se, but these were for significant criminal acts. *E.g., **Boler v. Mosby**,* 352 So.2d 1320, 1323 (Miss. 1977) (customer alleged that he was falsely accused of shoplifting meat from the defendants' store had a claim that was actionable per se); **Valley Dry Goods Co. v. Buford**, 114 Miss. 414, 427, 75 So. 252, 254 (1917) (accused of stealing $100 from cash register where worked, in conspiracy with someone else). We do not analyze the decisions from foreign jurisdictions that are cited, other than to note that the general national rule is well captured in the Restatement. As already indicated, that summary of the law provides that proof of damages is unnecessary only if the crime charged is sufficiently serious as to be punishable by imprisonment or is a crime that would be regarded by the public as involving moral turpitude. *Restatement* (Second) Torts § 571.

¶40. It is not the label used but the seriousness of the allegation that is important. Otherwise accusing someone of "theft" of a pencil, or a newspaper, or anything with an identifiable value no matter how minimal would be actionable per se. It is not uttering "thief" that presumptively steals the accused's good name, but only accusing someone of such a theft as would be a grave offense. The accusation of theft of the two sheets of paper is not in that category.

¶41. We return to one final authority for perspective. Since "it is not always the crime, but rather the character of the act charged, which will be determinative," this should be a court's focus:

> The idea toward which the courts obviously have been struggling is that imputation [of crime] is to be actionable without proof of damages only if it involves a major social disgrace, which might very well be the ultimate test.

Prosser & Keeton, Torts, § 112, at 789. This theft does not involve social disgrace.

¶42. We accept that the jury had discretion to determine that these statements were knowingly false and that Scott suffered anguish. We also find that Scott's concession that the only damage was non-monetary meant that no special harm had occurred. Further, Chief Speed's assertions that Scott lied to the firemen and that he was a thief for taking papers on a training program project for which he had been placed in charge, did not allege crimes involving moral turpitude or the prospect of infamous or disgraceful punishment.

¶43. We do not dismiss the statements as a frivolous matter. For purposes of the trial they were conceded to be false. Yet neither can we ignore that Scott failed in the proof necessary to obtain damages for Speed's actions. The trial court should have granted Speed's request for a peremptory instruction or later for a judgment notwithstanding the verdict. We, therefore, affirm the Court of Appeals' judgment, and we reverse the judgment by the Copiah County Circuit Court and render judgment here for Harold Speed finally dismissing Robert E. Scott's complaint and this action with prejudice.

¶44. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED, AND THE JUDGMENT OF THE COPIAH COUNTY CIRCUIT COURT IS REVERSED AND RENDERED.**

> **SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J., AND DIAZ, J. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., DIAZ AND EASLEY, JJ.**

> **BANKS, PRESIDING JUSTICE, DISSENTING:**

¶45. I respectfully dissent because, in my view, the majority opinion fails to give due regard to whether context is conveyed with the otherwise offending accusation. It is not enough to say that accusing one of being a thief is not slander or libel per se where the context makes it clear that the object of theft is not such that would render the act criminal. What must be said is that where the listener or reader knows or reasonably should know from the context that the act in question was not criminal, the accusation is not libelous per se. ***Burns v. Supermarkets Gen. Corp.***, 615 F. Supp. 154, 157 (E.D. Pa. 1985). This requires that the listener be aware of the context in which in the accusation is made. *Id.* In my view, an accusation that one is a thief, without more concerning context, is injurious per se. ***Boler v. Mosby,*** 352 So. 2d 1320, 1323 (Miss. 1977). Only where a context is given which makes it clear that the alleged conduct in question was not criminal is the per se injury removed.

¶46. A federal district court applying Pennsylvania law used this very analysis in ***Burns*** where a witness overheard an employer discharge an employee because his actions were "like stealing." 615 F. Supp. at 156. The issue, the court said, was whether under the circumstances the statement to the employee that "reducing the price of good produce improperly is like stealing" was reasonably capable of being understood as an imputation of a commission of a crime. *Id.* at 157. Generally, it is not. A witness,

however, overhearing the statement asserted that he understood the statement to mean just that. *Id.* The statement was not defamatory, however, because the witness was given sufficient underlying facts to form his own opinion that the statement was untrue. *Id.* at 158.

¶47. As indicated in the Restatement (Second) of Torts § 566 (1977), a listener's reasonable interpretation, which will be based in part on the context in which the statement appears, is the proper measure for whether the statement is actionable. *See also **Joyner v. Wear,*** 665 So.2d 634 (La. Ct. App. 1995) (question of whether communication is defamatory is answered by determining whether listener could have reasonably understood communication, taken in context, to have been intended in defamatory sense); ***Ward v. Zelikovsky***, 643 A.2d 972 (N.J. 1994); ***Alianza Dominicana, Inc. v. Luna,*** 645 N.Y.S.2d 28 (N.Y. App. Div. 1996)(courts must consider full context of communication in which statement appears including surrounding circumstances that signal readers or listeners that what is being read or heard is likely opinion, not fact).

¶48. In the instant case, the accusation was made several times on different occasions to different people. While the record reveals that on some occasions the context was given, there was a least one occasion in which the record shows no evidence of context for the accusation. With respect to that occasion, I would hold that the injury per se rule applies. I would, therefore, reverse the judgment of the Court of Appeals and affirm the judgment of the trial court.

### McRAE, P.J., AND DIAZ, J., JOIN THIS OPINION.

### McRAE, PRESIDING JUSTICE, DISSENTING:

¶49. The majority's assertions that Chief Speed's words were not sufficient to cause emotional distress are incomprehensible. Calling someone a liar and a thief during public meetings is damaging not only to his character and reputation, but can also cause emotional distress. The majority errs when it states that these words are not actionable without proof of special damages. The language used in this case clearly falls within the categories of slander per se, where no proof of special damages is required. Alternatively, we have an "actionable words" statute in this State, in addition to case law, holding that when someone is called a liar or a thief, those words are actionable. Accordingly, I dissent.

¶50. The majority asserts that because Speed's words were not supported by accusations of a felonious crime committed by Scott, that these words do not fall within the categories of slander per se, citing ***W.T. Farley, Inc. v. Bufkin***, 159 Miss. 350, 132 So. 86, 87 (1931); and therefore, no damages should be allowed in this case. There is no need for proof of special damages in this case because Speed's words to Scott easily fall into at least two categories of slander per se; either under words imputing the guilt or commission of a criminal offense or words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade, or business. *See **id.*** at 87.

¶51. Furthermore, Speed's words are actionable due to Miss. Code Ann. § 95-1-1 (1994), which states,

> All words which, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace, shall be actionable; and a plea, exception or demurrer shall not be sustained to preclude a jury from passing thereon, who are the sole judges of the damages sustained....

¶52. Calling someone a thief and a liar would fall into this category. These words are insulting to most

people, especially in professional situations or a situation where someone has been trusted with a certain amount of responsibility, such as the case at hand. Scott clearly had a cause of action under these circumstances. As the majority alludes to, Scott says he lost sleep, felt insulted and his reputation was besmirched. These are damages for a jury to determine.

¶53. Our case law also states that calling someone a liar and a thief is actionable. In ***Continental Cas. Co. v. Garrett***, 173 Miss. 676, 679, 161 So. 753, 754 (1935), an insurance salesman walked into a man's home, accused him of falsifying a claim, and subsequently stated, "you are a liar." This language was charged in the first of two counts against the insurance company; one for slander and the second for personal injury. Although the first charge of slander was dismissed by the trial court, the second count, also based upon the insulting language arising from this same incident, was upheld. Garrett was awarded punitive damages by the jury in the amount of $250.00, and we upheld this award. ***Id.*** at 755. This Court found that the "insulting language caused him [Garrett] to suffer mental anguish, and that his physical ailments were thereby aggravated and prolonged to his great damage." ***Id.*** at 754. Accordingly, since Scott was called a liar and a thief while working in a professional capacity, he should be allowed to recover these damages. The punitive damages awarded in this case should be upheld as this was an intentional tort and outrageous conduct.

¶54. There also need not be an actual physical injury for a person to recover damages in such a case. In ***First Nat'l Bank v. Langley***, 314 So. 2d 324, 338 (Miss. 1975), we stated that a plaintiff may recover damages for emotional distress due to willful or wanton acts, even in the absence of physical injury, *i.e.*, impact. ***Id.*** at 334. In ***Langley***, the plaintiff was falsely accused of losing a bank deposit by his employer and later sued his employer for physical and mental injuries arising from mental distress, among other grounds for suit. ***Id.*** at 325-29. We held that the element of physical impact was not required for the plaintiff to recover damages for emotional distress. ***Id.*** at 339.

¶55. The majority relies upon ***Woodville v. Pizatti***, 119 Miss. 85, 80 So. 491 (1919), stating that allegations of a crime would be actionable per se, but only if such allegations were to charge a person "with the commission of an act which, if true, would subject him to punishment-'for a crime involving moral turpitude, or would make him liable to a punishment infamous in character, <u>or to one which, if not necessarily infamous, would bring disgrace upon him</u>.' 17 R.C.L. 265". ***Id.*** at 492 (emphasis added). Speed's words constitute language that would, and did in fact, bring disgrace upon Scott.

¶56. It is true that in ***Pizatti***, the words were ambiguous and disputed among witnesses, and we found no clear indication that the words accused the plaintiff of the commission of a crime. However, we did state that the "words as they appear from the testimony should be held to be slanderous, but upon which we will express no opinion." ***Id.*** at 491. More importantly, ***Pizatti*** is easily distinguishable from this case because Speed specifically called Scott a "liar and thief." There was no ambiguity to Speed's words nor his accusations; and therefore, Scott should be able to recover his damages.

¶57. The majority also attacks the validity of ***Baugh v. Baugh***, 512 So. 2d 1283, 1285 (Miss. 1987),[(3)] where we stated "without doubt, an utterance falsely imputing a crime or accusing one of being a thief is actionable per se." ***Id.*** (citing ***Boler v. Mosby***, 352 So. 2d 1320, 1323 (Miss. 1977); ***Lemonis v. Hogue***, 213 Miss. 775, 780, 57 So. 2d 865, 866 (1952)).

¶58. The majority states that ***Baugh*** does not apply to this case because the cases it relies upon dealt with situations where a person was called a thief in regards to "significant criminal acts." However, the ***Baugh***

case itself considered whether the appellant's former daughter-in-law slandered him by telling a social security employee that she was not aware that her former father-in-law was disabled nor that he wore a neck brace. We found that these statements did not rise to such a level as to suggest that "Baugh was guilty of 'fraud, deceit, and trickery in obtaining money from thee Social Security Administration.'" ***Baugh***, 512 So.2d at 1285. We found this language not to be slander per se and stated that "the slander, however, must be clear and unmistakable from the words themselves and not be the product of any innuendo, speculation or conjecture." ***Id.*** (citations omitted). The language in the present case was not the product of innuendo, speculation or conjecture. Rather, Speed blatantly called Scott a liar and a thief. There is no question that this language falls in the category of slander per se and that Scott should be able to recover.

¶59. Speed's conduct in this case was outrageous as well as slander per se. This case was presented for a jury to do its duty. We should do ours and affirm the trial court's judgment and reverse the Court of Appeals' judgment. For these reasons, I dissent.

### BANKS, P.J., DIAZ AND EASLEY, JJ., JOIN THIS OPINION.

1. Restatement of Torts (Second) § 46 uses the heading "outrageous conduct" for the tort that it then describes with the elements for intentional infliction of emotional distress.

2. The Court did not cite its source for the quotation. We found no Mississippi court opinion from which this quote was obtained. The quote is similar but not identical to language in a source cited in the reported summary of briefs. 159 Miss. at 351, citing 25 Cyc. Law & Proc., *Libel & Slander* 264-65 (1907). The quote is not from the appellant's brief; the appellee's brief is not with the archived file in this or in a related case. Record Group 32, cause # 29,137, Miss. Dept. Archives & History; ***Ray v. W. T. Farley, Inc.***, 131 So. 365 (Miss. 1930), cause # 29,033.

3. This case was also relied upon in Court of Appeals Judge Bridges's dissenting opinion.