932 So.2d 810 (2005)
MORRIS NEWSPAPER CORPORATION d/b/a WXXV-TV and Tom MacArthur, Appellants/Cross-Appellees
v.
Rebecca ALLEN, Appellee/Cross-Appellant.
No. 2003-CA-00192-COA.
Court of Appeals of Mississippi.
October 25, 2005.
Rehearing Denied April 11, 2006.
*813 Henry Laird, Susan Fahey Desmond, Gulfport, attorneys for appellants.
John M. Harral, Gulfport, attorney for appellee.
EN BANC.

MODIFIED OPINION ON MOTION FOR REHEARING
BARNES, J., for the Court.
¶ 1. The appellee's motion for rehearing is granted. The original opinion is withdrawn and this opinion is substituted therefor.
¶ 2. Rebecca Allen sued Morris Newspaper Corporation and Tom MacArthur in the Circuit Court of Harrison County for defamation, intentional infliction of emotional distress and breach of an employment contract, including breach of the implied covenant of good faith and fair dealing. At the close of Allen's case, the court directed verdicts on Allen's claims for defamation and intentional infliction of emotional distress, leaving solely the breach of contract claim before the court. The jury returned a verdict for Allen in the amount of $227,000. Morris and MacArthur appeal, arguing that the trial court erred by allowing Allen to recover damages for mental anguish, by denying three of the defendants' motions in limine, by failing to grant a JNOV and by awarding post-judgment interest at the rate of eight percent. Allen cross-appeals, arguing that the trial court should have allowed the jury to consider punitive damages.
¶ 3. Finding no error, we affirm.

SUMMARY OF FACTS
¶ 4. The following facts were presented at the trial. Rebecca Allen was a news producer at WLOX-TV. She had a lifelong dream to be the anchor of a news program. In the summer of 1998, Allen began discussions with Tom MacArthur, the general manager of WXXV-TV, regarding employment as an anchor at a start-up news program at WXXV. WXXV is a Fox affiliate owned by Morris Newspaper Corporation. WXXV planned to begin broadcasting its news program in March 1999. In December 1998, MacArthur hired a news director, Tom Russo, and Russo and MacArthur agreed to hire Allen. Russo and MacArthur testified that they thought Allen was right for the job because, though she lacked experience as a full-time anchor, she was familiar with the Mississippi Gulf Coast, was a known radio personality with a morning radio show, would mature as an anchor and would accept a salary within WXXV's budget. Russo and MacArthur were aware that Allen was very excited about being an anchor.
¶ 5. Russo, MacArthur and Allen orally agreed that Allen was to function at WXXV as a news anchor and reporter. However, Allen and MacArthur later signed an employment contract providing that Allen accepted "such employment . . . *814 in such capacity and with such duties as assigned by News Director or his designee." The contract stated that Allen would be employed for three years and that WXXV could terminate Allen "upon thirty days prior notice to Employee for `Cause' (such Cause being specified therein) as reasonably determined in good faith by the General Manager of the Company." The contract provided for Allen's salary, totaling $71,000, and clothing allowance for each of the three years. The salary provided by the contract was $6,000 lower than the parties had originally intended; WXXV paid Allen the $6,000 in a lump sum to allow Allen to buy out her contract with WLOX, thus freeing her to work for a competing television station.
¶ 6. Allen began work at WXXV on February 1, 1999. For the first two or three weeks, Allen and the other employees performed manual labor such as painting and assembling furniture and equipment in order to get the station ready to broadcast the news. Later, Allen completed several reporting projects. WXXV's first news program was scheduled to air on the evening of Monday, March 15. Due to budget constraints, WXXV had been unable to hire seasoned employees or to obtain the best equipment; consequently, WXXV experienced a multitude of difficulties in preparing for the live news program. Because of the problems, Russo decided that the first show would be a taped program about the Beau Rivage casino instead of a live show. The Beau Rivage special was taped on March 15 and aired at 10:00 p.m. that night, an hour later than scheduled. Allen was the anchor on that show.
¶ 7. The Beau Rivage special was rife with problems that were apparent from viewing the show. The next day, the station began preparing for the first live news show scheduled for the next Monday. Allen left around 4:00 p.m. because she felt sick and called in sick Wednesday and Thursday.
¶ 8. On Friday, Russo and MacArthur met with Allen and told her she would no longer be the evening anchor. They demoted her to a reporter position at the same salary. They told her that she might be made an anchor in the future after gaining more experience as a reporter. Robin Uchima, originally hired as a reporter and an anchor for a planned morning show, was named Allen's replacement as the evening anchor. There was testimony that Uchima was a longtime friend of a Fox vice-president that had visited WXXV. Allen spent much of the meeting trying to convince Russo and MacArthur to change their minds about the demotion, but to no avail.
¶ 9. On Saturday, Allen called MacArthur in an effort to persuade him to change his mind about the demotion; however, he remained steadfast. On Sunday afternoon, Allen told Russo that she would perform the reporting job and would be in the next day. Then on Sunday evening, Allen phoned Russo and told him that she was sick and too physically and emotionally distraught over the loss of the anchor position to come to work for a few days, but that she had three completed reporting projects ready for broadcasting. According to his testimony, Russo told Allen that she was needed at WXXV to help prepare for Monday's live broadcast, but he allowed Allen to stay home because she maintained that she was unable to work.
¶ 10. On Monday morning, Allen performed her morning show on the radio. Russo, MacArthur and other WXXV employees heard Allen on the radio. Allen also performed the radio show on Tuesday and Wednesday and remained absent from WXXV. On Thursday, Allen came to work at WXXV and was called into a meeting with Russo, MacArthur and Warren Dearman, *815 the assistant news director. They requested that Allen quit, and Allen refused. Allen came to the station again on Friday, and MacArthur gave her the choice of resigning by signing a form or being fired. Because the resignation form required Allen to repay the $6,000 which WXXV had given her to buy out her WLOX contract, Allen refused to sign the form and left the station. She came to the station again on Monday, refused to sign the form and was fired. However, her salary was to continue for the next thirty days. After she was fired, Allen continued to work at the radio station and performed some singing jobs until October 2001, when WLOX rehired Allen, this time as a live reporter and full-time weekend anchor.
¶ 11. Russo testified that his decision to demote Allen was based upon her poor performance during tapings of the Beau Rivage special and upon a practice run with Uchima as the anchor, in which Uchima demonstrated superior performance. Russo and MacArthur testified that Allen had difficulty working with others at the station, was not a "team player" and that many other employees had made complaints about her behavior. MacArthur testified that Russo talked with Allen about her arriving late in the mornings after her radio show. Russo and MacArthur said that they and other employees were incensed that Allen performed her radio program after claiming that she was too distraught to work, leaving the other WXXV employees to put on the first live show without her. Russo stated that he wanted to fire Allen because, along with the other problems, when Allen performed the radio show while on sick leave from WXXV, "[s]omething [had] to give." MacArthur testified that Russo met with him and urged that Allen be fired, and MacArthur agreed.
¶ 12. Allen maintained that WXXV and MacArthur breached the contract by firing her without cause and claimed that her dismissal was based upon ulterior motives. Allen testified that the only reasons MacArthur communicated for the termination were that she was not a team player and that no one liked her. She stated that, at the termination meetings, MacArthur yelled and cursed at her, called her a "prima donna bitch" and "the Antichrist," and pounded on his desk. Allen stated that she had performed at her best at WXXV, that no one had ever come to her with criticism and that she had gotten along well with her fellow employees. The employee handbook required that all warnings and reprimands be kept in the employee's file, and no negative comments about Allen's job performance appeared in her file.
¶ 13. Allen testified that, after she was fired, she called MacArthur because she had not received her final paychecks. MacArthur refused to give her the checks until she signed a form promising to pay Morris the $6,000 Morris had given her to buy out her WLOX contract. Allen did not pursue the matter further, and received the checks four months later, after MacArthur left WXXV. MacArthur testified that his secretary called Allen and told her the checks were available but Allen never picked them up.
¶ 14. Allen speculated that her rejection of MacArthur's improper sexual advances caused her demotion and firing. Allen testified that MacArthur sexually harassed her on several occasions after she began work at WXXV. She stated that MacArthur had made several inappropriate comments about her appearance, had rubbed her back and hugged her and had once put his hand on her leg while making a left turn in a car. She also stated that on one occasion, MacArthur had called her at *816 home and asked her out for drinks. Allen offered evidence that MacArthur had engaged in extramarital affairs with two other WXXV employees. MacArthur admitted one such affair but denied that he ever harassed Allen. The jury unanimously found for Allen and awarded her $227,000 in damages.

LAW AND ANALYSIS
¶ 15. The statement of the issues below is taken verbatim from Morris's appellate brief.
I. THE CIRCUIT COURT'S ENTRY OF DIRECTED VERDICT IN FAVOR OF EMPLOYER DISMISSED ALL CLAIMS FOR RELIEF EXCEPT BREACH OF EMPLOYMENT CONTRACT.
II. EMOTIONAL DISTRESS DAMAGES ARE NOT RECOVERABLE IN BREACH OF EMPLOYMENT CONTRACT CASES SUCH AS THIS.
III. THE STANDARD FOR RECOVERY OF EMOTIONAL DISTRESS DAMAGES IS THE SAME AS THE STANDARD FOR RECOVERY OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS DAMAGES AND THE STANDARD FOR RECOVERY OF PUNITIVE DAMAGES; AND EMPLOYEE, REBECCA ALLEN, DID NOT MEET THAT STANDARD.
IV. THE CIRCUIT COURT ERRONEOUSLY GAVE THE JURY A TORT DAMAGES INSTRUCTION IN A BREACH OF CONTRACT CASE.
V. AFTER OVERRULING EMPLOYER'S MOTIONS IN LIMINE PRIOR TO TRIAL, THE COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED THE JURY TO CONSIDER EVIDENCE LEADING TO A VERDICT WHICH WAS THE SUBJECT OF BIAS, PASSION, PREJUDICE AND WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
VI. THE COURT SHOULD ENTER JUDGMENT NOTWITHSTANDING THE VERDICT.
VII EIGHT PERCENT INTEREST ON THE JUDGMENT IS EXCESSIVE.
¶ 16. We have recast Morris's issues regarding emotional distress damages and denial of a JNOV into the following issue:

I. WHETHER ALLEN WAS ENTITLED TO RECOVER COMPENSATORY DAMAGES FOR EMOTIONAL DISTRESS/MENTAL ANGUISH FOR BREACH OF THE EMPLOYMENT CONTRACT.
¶ 17. Allen presented testimony at the trial that she suffered emotional distress as a result of the termination. At the close of Allen's case, Morris moved for a directed verdict on all of Allen's claims. Allen confessed the motion as to her tort claims for defamation and intentional infliction of emotional distress, leaving solely her breach of contract claim before the court. Over Morris's objections, the trial court instructed the jury:
Should your verdict be for the plaintiff in this case, you may consider the following factors to determine the amount of compensatory damages to award as may be shown by a preponderance of the evidence:
1. The type of injuries to the plaintiff, if any, and their duration.
2. Past, present mental anguish, if any.

3. Lost salary for the duration of the contract.
4. Other damages incurred by the plaintiff as a result of the breach of the contract.
*817 (Emphasis added). The court also instructed the jury that Allen had a duty to mitigate loss of income by seeking other employment and that the jury must "reduce any award of damages to [Allen] by that amount of money [Allen] would have earned had she made reasonable efforts to become gainfully employed after leaving WXXV-TV and those amounts of money she did actually earn by becoming employed after leaving WXXV-TV, up to and until the end of the contract term." After the verdict, Morris moved for a JNOV or a new trial, arguing that Allen could not recover emotional distress damages for the breach of contract.
¶ 18. Morris correctly argues that the grant of a directed verdict on Allen's intentional infliction of emotional distress claim limited Allen's damages to those arising out of a breach of the employment contract. M.R.C.P. 50 cmt. Morris does not attack the jury's finding that the employment contract was breached. Morris's issues request that this Court determine (1) whether Allen was entitled to claim compensatory damages for mental anguish based upon the breach as a matter of law; (2) whether the jury instruction on mental anguish damages properly stated the law; and (3) whether Allen submitted sufficient evidence to enable her mental anguish claim to go to the jury.

A. Whether Allen was entitled as a matter of law to claim compensatory damages for mental anguish based upon the breach.
¶ 19. Morris argues that the entry of a directed verdict on Allen's tort claim for intentional infliction of emotional distress barred her ability to recover mental anguish damages based only upon the breach of contract. We disagree. Having proceeded solely on her breach of contract claim, Allen was entitled to pursue all damages flowing from the breach.
¶ 20. Our precedent demonstrates that mental anguish damages may stem from a breach of an employment contract in certain circumstances. The traditional rule in breach of contract cases is that damages for emotional distress cannot be recovered absent proof of an independent intentional tort separate from the breach of contract. Universal Life Ins. Co. v. Veasley, 610 So.2d 290, 295 (Miss.1992). In Morrison v. Means, 680 So.2d 803, 805-06 (Miss. 1996), the supreme court held that mental anguish damages were recoverable in a case of breach of a contract for sale of goods upon proof of the elements of the tort of intentional infliction of emotional distress. As there was insufficient evidence to prove intentional infliction of emotional distress, the Morrison court reversed the jury's award of mental anguish damages. Id. at 807. This analysis has been applied to a mental anguish claim arising from an alleged breach of an employment contract. Patrick v. B.C. Rogers Poultry, Inc., 800 So.2d 1218, 1220 (¶ 6) (Miss.Ct.App.2001).
¶ 21. Allen argues that the supreme court has relaxed the standard for recovering mental distress damages for a contract breach.[1] She originally cited Universal Life, in which the supreme *818 court allowed recovery for mental anguish resulting from the breach of an insurance contract when the breach was accompanied by negligent conduct and emotional injury was an "entirely foreseeable" result of the negligence. Universal Life, 610 So.2d at 295. The case of Southwest Miss. Reg'l Med. Ctr. v. Lawrence, 684 So.2d 1257, 1269 (Miss.1996), involved a breach of an employer's self-insurance agreement. The court stated that the majority view on recovery for emotional distress damages requires (a) an intentional or at least grossly negligent tort or (b) negligence accompanied by physical impact. The court recognized that it had issued a series of cases relaxing the majority rule, including Universal Life. Id. The Southwest court stated that "[t]he upshot of these cases in the present rule is a plaintiff may recover for emotional injury proximately resulting from negligent conduct, provided only that the injury was reasonably foreseeable by the defendant." Id. The viability of the reasonable foreseeability standard was affirmed in Adams v. U.S. Homecrafters, Inc., 744 So.2d 736, 743 (¶ 21) (Miss.1999), involving the breach of a homebuilder's warranty.
¶ 22. The supreme court revisited this issue in American Bankers' Insurance Co. v. Wells, 819 So.2d 1196, 1208-09 (¶¶ 40-43) (Miss.2001). The court acknowledged that it had not overruled the line of cases applying the minority view sanctioning recovery for emotional distress based upon reasonable foreseeability. Id. at (¶ 41) (citing Southwest, 684 So.2d at 1269; Universal Life, 610 So.2d at 295). The court explained that it had most recently followed the majority view barring recovery for "mental anguish unaccompanied by demonstrable physical or mental injury" unless the defendant's conduct was "malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." Id. at (¶¶ 40, 43) (citing Summers ex rel. Dawson v. St. Andrew's Episcopal Sch., Inc., 759 So.2d 1203, 1211-12 (¶ 34) (Miss.2000)). Then, the court concluded, "[a] plaintiff therefore may not recover emotional distress damages resulting from ordinary negligence, without proving some sort of physical manifestation of injury or demonstrable physical harm." Id. at (¶ 43).
¶ 23. Such was the state of the law at the time we issued our first opinion in this matter. We held that Morris and MacArthur's conduct, while certainly inappropriate and upsetting, was not sufficiently malicious, intentional, willful, wanton or reckless to support a claim of intentional infliction of emotional distress. However, while Allen's case was before this Court on petition for rehearing, the supreme court revisited the issue of emotional damages in contract cases, stating:
We take this opportunity to clarify the burden for recovery of mental anguish and emotional distress in breach of contract actions. Plaintiffs may recover such damages without proof of a physical manifestation. Furthermore, expert testimony showing actual harm to prove mental injury is not always required. However, the plaintiff must show (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as "it made me feel bad," or "it upset me" are not sufficient. A plaintiff must show specific suffering during a specific time frame. These requirements are not different from the requirements to establish physical pain and suffering.
University of Southern Mississippi v. Williams, 891 So.2d 160, 172-73 (¶ 31) (Miss.2004) (decided November 10, 2004 and rehearing denied January 20, 2005) (footnotes and citations omitted). Further, *819 the Court focused on what it called "the nature of the incident":
Thus, "the nature of the incident" can be important in two ways. First, understanding the nature of the incident is essential in establishing whether emotional distress is foreseeable. Additionally, in cases where the defendant's conduct is more egregious, the plaintiff's burden of establishing specific proof of suffering will decrease. Nevertheless, the burden is there, and a plaintiff seeking emotional distress damages for a breach of contract must provide more than general declarations of emotional distress.
Williams, 891 So.2d at 173 (¶ 33).
¶ 24. Due to the possible effect of Williams, the parties were invited to submit additional arguments on the pending motion for rehearing regarding the effect of the new decision. Allen, in her additional brief, argues that Williams does not require any finding of negligent or intentional infliction of emotional distress and, therefore, the jury instructions were proper. We agree. However, Allen must still satisfy the two Williams factors in order to establish her right to emotional distress damages: First, she must prove that mental anguish was a foreseeable consequence of the breach, and second, she must prove that she actually suffered mental anguish. Williams, 891 So.2d at 173 (¶ 31).

B. Whether Allen submitted sufficient evidence to enable her mental anguish claim to go to the jury.
¶ 25. Morris argues that the trial court erroneously denied its motion for a JNOV regarding Allen's claim for mental anguish damages. A motion for a JNOV challenges the legal sufficiency of the evidence. Investors Prop. Mgmt., Ltd. v. Watkins, Pitts, Hill & Assoc., 511 So.2d 1379, 1381 (Miss.1987). We review the denial of a JNOV by considering all of the evidence in the light most favorable to the party opposed to the motion and giving that party the benefit of all favorable inferences that might be drawn from the evidence. C & C Trucking Co. v. Smith, 612 So.2d 1092, 1098 (Miss.1992). If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable persons could not have arrived at a contrary verdict, then the motion should be granted. AmSouth Bank v. Gupta, 838 So.2d 205, 211 (¶ 12) (Miss. 2002). But, if there is substantial evidence supporting the verdict, this Court must affirm. Id.
¶ 26. In accordance with Williams, Allen must show that mental anguish was a foreseeable consequence of the particular breach of contract, and that she actually suffered mental anguish as a result of the breach. Williams, 891 So.2d at 173 (¶ 31). Allen contends that it was reasonably foreseeable that the wrongful termination would cause her severe emotional distress given Morris and MacArthur's knowledge of her strong desire to work as an anchor. Allen contends that there was sufficient evidence showing that Morris and MacArthur's conduct surrounding the wrongful termination was egregious, further demonstrating the foreseeability of mental anguish. Allen cites MacArthur's angry cursing and name-calling at the termination meetings as evidence of outrageous behavior. Allen also argues that MacArthur's withholding of her paychecks until she paid Morris the WLOX contract buy-out sum of $6,000 was outrageous conduct supporting an award of emotional distress damages.
¶ 27. Allen testified that, after the firing, she was disheartened and she experienced a long period of depression. She lost weight, had an upset stomach and had difficulty sleeping through the night. She *820 resumed smoking cigarettes. She was stressed over the loss of income, and felt embarrassed and fearful over the prospect of seeking another anchor job and having to admit she was fired. Allen's former roommate testified that for over a year Allen went through "an extreme state of depression and shock" after the firing, and that she cut herself off from everyone except her family. Allen's husband, Ben Powers, who was then her fiance, testified that Allen was depressed for four to five months after she was fired. Powers stated that for eight to nine months afterward, when Allen was not doing her radio show, she would lock herself in her room watching television with the lights off.
¶ 28. It is this Court's opinion that Allen satisfied the Williams requirements of foreseeability and actual mental anguish. Thus, taking the above testimony into consideration, we cannot say that the facts and inferences weigh so favorably in favor of the defendants that reasonable jurors could not have arrived at a contrary verdict. The evidence offered by Allen could convince reasonable jurors that she suffered compensable mental distress.[2] We therefore find that the trial court properly denied Morris's motion for JNOV.
¶ 29. The dissent suggests that the jury was not properly instructed because it was never explicitly told to limit the amount of damages awarded to Allen to those caused by the breach of contract. However, given the opportunity to address the effect of Williams on the present case, the appellants never raised this issue. Regardless, we will address the point briefly.
Instruction P-7, given by the court, stated in part:
If you find from the preponderance of the evidence in this case that the plaintiff has sustained actual damage as a proximate result of a breach of the contract, then the plaintiff is entitled to a verdict in an amount which will reasonably compensate the plaintiff for her loss sustained.
(Emphasis added). This instruction clearly informed the jury that it was to limit its award to those damages proximately caused by the breach of contract. Furthermore, because the trial court granted directed verdicts against Allen on her defamation and intentional infliction of emotional distress claims, the only claim before the jury was for breach of contract; the jury had no other compensable wrong before it. Taking these facts into consideration, we see no grounds for holding that the jury was not properly instructed.

II. WHETHER THE TRIAL COURT ERRED IN DENYING MORRIS'S MOTIONS IN LIMINE.
¶ 30. Morris appeals from the trial court's denial of three of its motions in limine. We review the trial court's admission or exclusion of evidence for abuse of discretion. Terrain Enterprises, Inc. v. Mockbee, 654 So.2d 1122, 1131 (Miss.1995). If the lower court applied the correct legal standard, we will affirm if the decision was "one of several reasonable ones which could have been made." Pierce v. Heritage Properties, Inc., 688 So.2d 1385, 1388 (Miss.1997). Even if the lower court's decision *821 was incorrect, we will not reverse unless the error affected a substantial right of a party. M.R.E. 103(a).

A. Motion to exclude evidence of Allen's competence as a news anchor subsequent to her termination from WXXV.
¶ 31. Several witnesses who worked with Allen at WLOX testified that she was a competent news anchor both before she left WLOX to go to WXXV and after she resumed work at WLOX in October 2001. Morris argues that the trial court should have excluded this testimony under Mississippi Rule of Evidence 403 because it was more prejudicial than probative. Morris contends that the evidence was irrelevant and unduly prejudicial because it related to Allen's performance after leaving WXXV. Morris also complains that the testimony was prejudicial because it was delivered by WLOX news anchors who were well-known on the Mississippi Gulf Coast and probably regarded by the jurors as worthy of elevated respect.
¶ 32. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. Mississippi Rule of Evidence 403 provides that evidence, though relevant, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." On appellate review, this Court does not "engage anew in the 403 balancing process," but limits its inquiry to whether or not the trial court "abused its discretion in weighing the factors and admitting or excluding the evidence." Gen. Motors Corp. v. Jackson, 636 So.2d 310, 314 (Miss.1992).
¶ 33. Allen offered the evidence of her competence at WLOX both before and after she worked at WXXV to show continuity in the high quality of her job performance. At the motion hearing, Morris argued that the evidence was irrelevant because time had elapsed between Allen's departure from WXXV and her return to WLOX. Morris argued the evidence was highly prejudicial because it could mislead the jury into thinking that Allen performed just as well at WXXV as she did after gaining experience as a weekend anchor at WLOX. The trial court rejected this argument, holding that the evidence was relevant to show the continuity of Allen's job performance and not unduly prejudicial because its weight and credibility could be thoroughly attacked on cross-examination.
¶ 34. We find that the trial court's admission of the evidence of Allen's subsequent job performance was not an abuse of discretion. The evidence was relevant because it tended to disprove Morris's contention that Allen performed poorly at WXXV and that she was fired for cause. The trial court acted well within its discretion in finding that the testimony about Allen's subsequent performance at WLOX was fertile ground for cross-examination. Further, because Morris admitted that the other WLOX anchors could testify about Allen's work at WLOX before she went to WXXV, the status of the anchors in the community is not a legitimate ground for objecting to their testimony about her subsequent performance at WLOX. This issue is without merit.

B. Motion to exclude evidence of MacArthur's sexual or romantic conduct.
¶ 35. Morris moved to exclude the evidence of MacArthur's affairs and his sexual and romantic conduct. The main thrust of Allen's case was that she was a *822 competent anchor and that the real reason she was terminated was that she rejected MacArthur's sexual advances. The court found that the evidence was relevant to show the motive for Allen's termination and admitted the evidence pursuant to Mississippi Rule of Evidence 404(b). On appeal, Morris does not contest the trial court's Rule 404(b) ruling, but argues that the evidence was irrelevant because Allen failed to file a sexual harassment suit after receiving a right to sue letter from the Equal Employment Opportunity Commission, or because Russo was wholly responsible for Allen's firing and demotion. Morris also avers that the evidence was more prejudicial than probative under Mississippi Rule of Evidence 403.
¶ 36. Morris's relevance argument is without merit. Allen's failure to pursue a sexual harassment lawsuit attacking MacArthur's behavior does not moot the relevance of that behavior in her wrongful termination suit. This is because Allen alleged her rejection of MacArthur's sexually harassing behavior as the motive for her termination. The evidence of his sexual and romantic conduct toward Allen and others was certainly relevant to show that MacArthur had an impermissible motive for the firing.
¶ 37. Morris also argues that the evidence was irrelevant because the evidence showed that Russo, not MacArthur, was entirely responsible for terminating Allen. That contention does not comport with the evidence presented at the trial. Russo testified that he merely recommended Allen's termination to MacArthur. MacArthur testified that he and Russo made the decision to terminate Allen, and that he, MacArthur, wanted Allen to be fired. Because a fact question existed as to MacArthur's level of involvement in the termination decision, the evidence of his sexual and romantic conduct was relevant to show his possible wrongful motive for firing Allen.
¶ 38. The trial court did not perform an on-the-record balancing of prejudice and probative value of the sexual conduct evidence under Rule 403. As discussed above, the evidence of MacArthur's sexual conduct was especially probative because it tended to show MacArthur's motive for the wrongful termination, and the main thrust of Allen's case was that she was fired for reasons other than those stated by Morris. "The more probative the evidence is, the less likely it is that a 403 factor will be of sufficient consequence to substantially outweigh the probative value. . . ." Miss. Power & Light Co. v. Lumpkin, 725 So.2d 721, 732 (¶ 55) (Miss.1998). The trial court's ruling was certainly within its discretion, and we affirm the admission of the evidence of MacArthur's sexual and romantic conduct.

C. Motion to exclude evidence of the reason for MacArthur's termination by WXXV.
¶ 39. WXXV terminated MacArthur in July 1999 for financial improprieties and faulty record keeping. Morris moved to exclude evidence of the reasons MacArthur was fired. The court granted the motion in part and overruled the motion in part, allowing Allen to explore the grounds for MacArthur's separation from WXXV only if MacArthur testified about his credentials to evaluate Allen's competency and his decision to terminate Allen based on the evaluation. On direct examination, Morris elicited testimony from MacArthur about the reasons he was fired. MacArthur's testimony indicated that his termination was based upon relatively minor mistakes. On cross-examination, Allen questioned MacArthur about the truthfulness of his explanation for the termination. *823 Morris did not contemporaneously object to this line of questioning.
¶ 40. Morris elicited the very testimony on direct examination which it had sought to exclude via the motion in limine. Morris's elicitation of the testimony waived its standing objection, and opened the door to Allen's cross-examination on the same subject. Cheeks v. State, 843 So.2d 87, 91 (¶ 9) (Miss.Ct.App.2003). If any valid argument existed supporting Morris's position, that argument was waived by Morris's failure to contemporaneously object to the cross-examination. Id. Thus, Morris cannot now be heard to complain, and this issue is without merit.

III. WHETHER THE TRIAL COURT'S IMPOSITION OF EIGHT PERCENT INTEREST ON THE JUDGMENT IS EXCESSIVE.
¶ 41. The trial court requested suggestions from the parties for an appropriate rate for post-judgment interest. Morris submitted a letter proposing rates charged by federal courts and commercial lenders equal to or less than 4.75 percent. In its order overruling Morris's post-trial motions, the trial court imposed post-judgment interest at a rate of eight percent. Morris argues that eight percent is too high considering rates charged by the federal courts and commercial lenders.
¶ 42. Mississippi Code Annotated section 75-17-7 (Rev.2000) states that "[a]ll judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint." A former version of section 75-17-7 provided that "[a]ll other judgments and decrees shall bear interest at the rate of eight percentum (8%) per annum." Preferred Risk Mut. Ins. Co. v. Johnson, 730 So.2d 574, 580 (¶ 31) (Miss. 1998) (citing Miss.Code Ann. § 75-17-7 (1975)). In Preferred Risk, the trial court imposed a post-judgment interest rate of eight percent under the revised statute. Id. at (¶ 31). The supreme court held that the trial court acted within its discretion in ordering the eight percent interest rate. Id. As in Preferred Risk, in this case the lower court was within its discretion in imposing the eight percent post-judgment interest rate pursuant to the revised section 75-17-7.

ISSUE ON CROSS-APPEAL

I. WHETHER THE CIRCUIT COURT SHOULD HAVE ALLOWED THE JURY TO CONSIDER PUNITIVE DAMAGES.
¶ 43. Allen argues on cross-appeal that the trial court erred by denying her request to submit her claim for punitive damages to the jury. The propriety of punitive damages for breach of contract is governed by the common law. Am. Funeral Assurance Co. v. Hubbs, 700 So.2d 283, 286 (Miss.1997). "In order for punitive damages to be awarded, the plaintiff must demonstrate a willful or malicious wrong or the gross, reckless disregard for the rights of others." Paracelsus Health Care Corp. v. Willard, 754 So.2d 437, 442 (¶ 20) (Miss.1999). In our former opinion in this case we concluded that Morris's conduct was not sufficiently malicious, intentional, willful, wanton or grossly reckless to support a claim of intentional infliction of emotional distress. While we find that under the clarified Williams burden of proof Allen met the requirements for establishing her right to emotional distress damages, we retain our original opinion *824 that the evidence given is insufficient to support an award of punitive damages. This issue is therefore without merit.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING AND MYERS, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. GRIFFIS AND ISHEE, JJ., NOT PARTICIPATING.
CHANDLER, J., Concurring in Part, Dissenting in Part:
¶ 45. In our original opinion in this case, the voting members of this Court unanimously found that Allen had failed to present sufficient evidence to enable her mental anguish claim to go to the jury. Now, relying on the supreme court's clarification of the applicable law in University of Southern Mississippi v. Williams, 891 So.2d 160 (Miss.2004), the majority finds that the trial court properly allowed Allen's mental anguish claim to go to the jury and that the jury instruction on mental anguish was correct. In my opinion, the majority construes Williams's clarification of the law too broadly. Williams did not expressly overrule our precedent concerning mental anguish damages. Based upon Williams and our other precedent, I believe that mental anguish damages were improper in this case and that the majority's conclusion serves to undermine accepted principles governing damages for breach of contract. Therefore, I respectfully dissent from the majority's decision to affirm the award of mental anguish damages. I would reverse and remand for a new trial limited to the issue of Allen's actual damages for breach of contract, excluding damages for mental anguish. I concur with the majority's resolution of the other issues raised in this appeal.
¶ 46. Allen's sole theory of recovery in this case was for breach of an employment contract. Usually, contract damages are based on the injured party's expectation interest and seek to give the injured party the benefit of the bargain in the form of a sum of money that will place the party in as good a position as she would have been in had the contract been performed. Theobald v. Nosser, 752 So.2d 1036, 1042 (¶ 22) (Miss.1999). A wrongfully discharged employee's expectation interest in the employment contract is "the total amount of the unpaid wages that were promised to h[er]for h[er] service, less the amount that [s]he can earn by making reasonable effort to obtain similar service under another employer." Fuselier, Ott & McKee, P.A. v. Moeller, 507 So.2d 63, 67 (Miss.1987). In no event must a successful lawsuit place the injured party in a better position than she would have been in if the contract had been performed. Wilson v. Gen. Motors Acceptance Corp., 883 So.2d 56, 66 (¶ 39) (Miss.2004). The injured party is entitled to just and adequate compensation for the breach, but no more. McDaniel Bros. v. Jordy, 195 So.2d 922, 925 (Miss.1967).
¶ 47. Traditionally, mental anguish damages were not an ordinary component of recovery for a breach of contract because, to obtain such damages, the prevailing party had to prove an independent tort. See Sw. Miss. Reg'l Med. Ctr. v. Lawrence, 684 So.2d 1257, 1269 (Miss. 1996). Although the court abandoned that requirement, our analysis of whether emotional distress damages were recoverable for a breach of contract still generally focused on whether the breaching party's conduct was tortious. Morrison v. Means, *825 680 So.2d 803, 806 (Miss.1996). If the breaching party was guilty of intentional, malicious, willful, wanton or grossly careless conduct, the non-breaching party could recover damages for emotional distress if she proved that emotional distress was a reasonably foreseeable result of the conduct and proved that she actually suffered emotional distress. Adams v. U.S. Homecrafters, Inc., 744 So.2d 736, 742 (¶ 17) (Miss.1999). If the breaching party's conduct was merely negligent, the court sometimes required the plaintiff to show that she had suffered some type of demonstrable physical harm in order to recover for emotional distress. Am. Bankers' Ins. Co. of Fla. v. Wells, 819 So.2d 1196 (¶ 43) (Miss.2001); Adams, 744 So.2d at 741-43 (¶¶ 16-21). The court consistently held that, in cases of intentional or negligent conduct, mental anguish must have been a reasonably foreseeable result of the breach. The court applied this general framework with fair consistency to claims of mental anguish damages, whether the claims were based upon a tort or upon a breach of contract. Wilson v. Gen. Motors Acceptance Corp., 883 So.2d 56, 63-66 (¶¶ 26-37) (Miss.2004); Am. Bankers' Ins. Co. of Fla., 819 So.2d at 1208-09 (¶¶ 40-45); Whitten v. Cox, 799 So.2d 1, 9-13 (¶¶ 13-25) (Miss.2000); Adams, 744 So.2d at 741-44 (¶¶ 16-22); Morrison, 680 So.2d at 805-07.
¶ 48. In my view, Williams has not radically altered the law pertaining to mental anguish damages for breach of contract. Williams did specifically withdraw the requirement that a plaintiff show physical injury to recover mental anguish damages for merely negligent conduct attending a breach of contract, which provided an important clarification in light of the court's prior conflicting opinions. See Adams, 744 So.2d at 741-43 (¶¶ 16-21). Williams instructs that a plaintiff may recover damages for mental anguish caused by a breach of contract when the plaintiff shows "(1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish." Williams, 891 So.2d at 173 (¶ 31). In determining whether the plaintiff has met this burden, Williams does not employ the analysis classifying the breaching party's conduct as either intentional or negligent. But, Williams does require an examination of the "nature of the incident" alleged to have caused emotional distress in order to determine both foreseeability and whether the plaintiff actually suffered mental anguish. Id. at 173 (¶ 33). Williams provides that, when the incident is "more egregious," then less proof of actual mental anguish is required. Id. And, understanding the nature of the incident is "essential" to determining whether the emotional distress was foreseeable. Id. Logically, the more egregious the incident alleged to have caused emotional distress, the more likely it is that the emotional distress would have been a foreseeable result of the incident. As an example of a case where less proof of mental suffering was required due to the "more egregious" nature of the incident, Williams cited Whitten v. Cox, 799 So.2d 1, (¶¶ 10-11) (Miss.2000), in which the court found that mental anguish damages were properly awarded to plaintiffs who suffered anxiety and other mental suffering after having been taken prisoner by an armed man who shot their truck and made death threats. Williams stated that, for proof of actual mental anguish to be sufficient, a plaintiff must show more than generalizations such as "it made me feel bad," or "it upset me." Id. at 173 (¶ 32). Finally, Williams limits the damages recoverable for mental anguish to the mental anguish actually caused by the breach of contractthat anguish engendered *826 by the non-breaching party's failure to receive the benefit of the bargain due to the defendant's actions. Id. at 174 (¶¶ 39-40). Recovery is not available for mental anguish caused by tortious conduct accompanying the breach. Id. However, the Williams court considered such tortious conduct in assessing the egregiousness of the breach of contract at issue. Id. at (¶¶ 35-36).
¶ 49. It appears that Williams articulated a simple balancing test focusing on the nature of the incident that, if properly applied, should yield results similar to those reached in our prior cases concerning damages for emotional distress. When the conduct of the party breaching the contract is egregious, it is more probable that the plaintiff will meet her burden of proof and be entitled to a jury instruction on mental anguish damages. Thus, it remains easier for a plaintiff to meet her burden of proof if the breach of contract or attendant conduct was intentional, malicious, willful, wanton, grossly careless and "evokes outrage or revulsion." See Morrison, 680 So.2d at 806. In those situations, it will be more likely that emotional distress was a reasonably foreseeable result of the incident and that the plaintiff will be able to sufficiently prove that actual mental anguish was caused by the breach of contract. And, in situations in which the breaching party's conduct was less egregious, the plaintiff will shoulder greater difficulty in establishing that she suffered actual mental anguish that was a foreseeable consequence of the particular breach of contract.
¶ 50. In Williams, the following evidence was deemed sufficient to undergird mental anguish damages. In 1985, Williams enrolled in the English program at the University of Southern Mississippi as a doctoral student. Eleven years later, she sued USM and several of its employees for breach of the duty of good faith and fair dealing inherent in its agreement to allow her to matriculate as a doctoral student. Williams alleged that USM and its employees had engaged "in a wrongful and malevolent course of conduct which prevented her from attaining her doctoral degree and caused severe emotional and mental anguish." At the trial, Williams's academic records established that she had been an exemplary student while enrolled at USM. In 1989, Williams's dissertation committee approved her prospectus, clearing her to complete the research and writing process and then to defend her dissertation before the committee, the final steps to attaining her Ph.D. degree.
¶ 51. However, Williams was never able to defend her dissertation due to obstructive conduct by USM's employees. Williams endured repeated sexual harassment from the chair of her dissertation committee, Rex Stamper. In February 1989, Stamper sent Williams a sexually inappropriate Valentine card, which was admitted into evidence. Williams described a visit Stamper paid to her home in 1990 when he attempted to sexually assault her. Stamper pushed Williams onto a table, got on top of her, ran his hands over her body, and made comments implying that if Williams did not have sex with him, he would not approve her dissertation. Immediately, Williams reported Stamper's behavior to the Dean of the College of Liberal Arts and the Chair of the English department, but no action was taken. Stamper remained a member of Williams's dissertation committee and continued to sexually harass her until her marriage in 1992. In addition to the sexual harassment Williams endured at the hands of Stamper, USM faculty and staff repeatedly and unjustifiably blocked Williams's efforts to complete her degree requirements. From 1991 to 1994, Williams sent letters to Dr. Harry *827 McCraw, the new head of the dissertation committee, requesting advice on how to proceed and requesting meetings to discuss the situation. In 1994, Dr. McCraw finally met with Williams and was able to make plans to finish all work, defend the dissertation, and receive her degree by December 1995. But, no one from USM communicated with Williams until June 1995, when Dr. McCraw sent her a letter apologizing for his "unconscionable" lack of an earlier communication but also stating that her dissertation was not a viable project and that she would have to start over on a whole new project. In December 1995, Williams sent a complaint letter to the Dean of the College of Liberal Arts, but received no meaningful response. After several more fruitless meetings and communications with USM officials, Williams sued and recovered $800,000 in compensatory damages.
¶ 52. Williams and others testified extensively about the effect of Stamper's sexual harrassment and USM's dilatory tactics upon her emotional health. Williams stated that, hours after Stamper's sexual assault, she considered suicide and her son had to wrestle a gun away from her. Williams said that she suffered paralyzing trauma from the lack of guidance, game playing and sexual harassment connected with the dissertation. She felt strong dread and disgust even at the word "dissertation." A licensed professional counselor and friend of Williams testified that Williams had been traumatized and very upset by USM's conduct. He said that Williams was under a lot of stress, was not sleeping well and talked about the problem all the time. Williams's son stated that Williams was unbearably stressed and afraid. Her husband stated that she had suffered "a tremendous trauma" that had manifested in her constant need for a safe environment and for people around her to convey a sense of security. He said that Williams had developed insomnia and constantly practiced hyper-vigilant behavior in an effort to guarantee her own safety at all times.
¶ 53. The supreme court found that Williams provided sufficient evidence she had suffered actual emotional distress which had been foreseeable given the conduct of USM and its employees. Williams, 891 So.2d at 174 (¶ 39). Since Williams's tort claims were barred under the Mississippi Tort Claims Act, Williams's only viable theory of recovery was for breach of contract. Id. at 175 (¶ 45). Accordingly, the court held that Williams's recovery for mental anguish should be specifically limited to anguish caused by USM's creation of an adverse academic environment and that she could not recover under the contract theory for any mental anguish caused by Stamper's objective wrongful conduct. Id. at 174 (¶ 40). The court reversed for a retrial on the issue of damages at which the jury would be so instructed. Id. The court also held that the $800,000 general verdict was too speculative because Williams had failed to prove her damages to a reasonable degree of certainty. Id. at 175-76 (¶ 46).
¶ 54. I turn to the evidence pertaining to Allen's claim for mental anguish damages in the instant case. The evidence submitted by Allen and Morris conflicted materially as to the reason for Allen's termination and the facts and circumstances surrounding it. The evidence favoring Allen amounted to the following facts. It was undisputed that Morris was aware of Allen's strong desire to work as an anchor. There was testimony indicating that Morris demoted Allen from the anchor position in order to replace her with Robin Uchima. Shortly thereafter, Morris terminated her without the required notice. Allen testified that, at the termination meeting, MacArthur yelled and cursed at her and that *828 he attempted to withhold her paychecks until she paid Morris the WLOX contract buyout sum of $6,000. Allen also testified about several incidents involving MacArthur that she characterized as sexual harassment, which occurred during the approximately four months in which she was employed by Morris. These consisted of several inappropriate comments which MacArthur made about her appearance, that he had rubbed her back and hugged her, that he had put his hand on her leg while making a left turn in a car, and that, once, he had called her at home and asked her out for drinks. There was testimony from Allen, her boyfriend, and her roommate that after the firing Allen was shocked and depressed, had an upset stomach, had difficulty sleeping, resumed smoking cigarettes, and lost weight.
¶ 55. The majority finds that these facts support Allen's recovery of mental anguish damages for the breach of contract in addition to her expectation interest in the contract. With respect, I disagree with the majority's conclusion. In my opinion, considering our precedent governing wrongful discharge claims and the evidence in Williams, Morris's breach of Allen's employment contract was not sufficiently egregious to warrant mental anguish damages given the proof of actual mental suffering submitted by Allen.
¶ 56. As recognized by the majority, in our first opinion in this case, we found that the conduct of Morris and its employee, MacArthur, was insufficiently malicious, intentional, willful, wanton, or grossly careless to constitute outrageous conduct justifying her recovery for intentional infliction of emotional distress. We so held based upon our precedent refusing to sanction an employee's recovery for emotional distress in situations involving "ordinary employment dispute[s]." Brown v. Inter-City Fed. Bank for Sav., 738 So.2d 262, 265 (¶ 9) (Miss.Ct.App.1999). For example, in Diamondhead Country Club and Prop. Owners Ass'n v. Montjoy, 820 So.2d 676, 678 (¶ 1) (Miss.Ct.App.2000), Montjoy was terminated and sued his former employer for intentional infliction of emotional distress. When Montjoy was fired, board members watched Montjoy pack his things and told him that they wanted to make sure he did not take anything belonging to the employer. Id. at 684 (¶ 22). He was escorted out of the building by security in front of the other staff. Id. He also claimed that the employer conspired to fire him by asking other employees to look for incriminating evidence against him. Id. Montjoy said that this treatment made him "feel cheap," and, in disappointment over the loss of his job and his perceived loss of standing in the community, he "went into mourning" at home. This Court stated that, while the employer's desire to get rid of Montjoy and its request that other employees gather evidence against him might have been a little upsetting, it simply did not rise to the level of extreme and outrageous conduct justifying recovery for Montjoy's mental anguish. Id. at (¶ 23).
¶ 57. In Raiola v. Chevron U.S.A., Inc., 872 So.2d 79, 85 (¶ 24) (Miss.Ct.App.2004), Raiola argued that he was wrongfully terminated and that at a meeting discussing the termination, his employer called him a thief and made inappropriate remarks about his Italian heritage. The Court held that the employer's conduct was not extreme and outrageous to justify redress. Id. Similarly, in Speed v. Scott, 787 So.2d 626, 629 (¶ 10) (Miss.2001), Scott, a volunteer fireman, alleged that the fire chief called him a thief at one meeting, a liar and a thief at another meeting, repeated the phrase at a fireman's meeting, and used the phrase "liar and thief" about him at someone's house. Scott and his wife testified that the name-calling caused him *829 severe emotional distress. Id. at (¶¶ 11-12). The court rejected Scott's claim of intentional infliction of emotional distress, finding that the fire chief's actions were not "such conduct as would cause a person of ordinary sensibilities to suffer outrage or revulsion." Id. at (¶ 20). In Brown v. Inter-City Fed. Bank for Savings, 738 So.2d 262, 263 (¶ 2) (Miss.Ct.App.1999), the employer had made several comments indicating that Brown's age rendered her a less desirable employee than a younger person and, later, fired her. The Court stated that an ordinary age discrimination claim such as Brown's was insufficient to establish the tort of intentional infliction of emotional distress. Id. at 265 (¶ 10).
¶ 58. All of the aforementioned precedent concerned tort claims of intentional infliction of emotional distress in the employment context. In each case, the court found that the employer's conduct, though inappropriate and upsetting, did not justify recovery for emotional distress. In my opinion, the evidence in the case sub judice was comparable to that in Diamondhead, Raiola, Scott and Brown. The circumstances surrounding Allen's departure from WXXV were not particularly remarkable in the context of termination of employment. They involved angry and inappropriate name-calling by Allen's supervisor, the supervisor's use of leverage to try to recover the employer's expenditure in hiring Allen, and Allen's allegation of minor incidents of sexually inappropriate conduct by the supervisor which Allen never reported. I note that Allen's demotion from anchor to reporter was not a breach of her employment contract because she did not contract with Morris to be an anchor, but to perform "employment. . . in such capacity and with such duties as assigned by News Director or his designee." To me, Allen's situation fundamentally constituted an ordinary employment dispute in which the employer's conduct was not particularly egregious.
¶ 59. Also, the conduct at issue here was significantly less shocking than that described in Williams. While the "sexual harassment and game-playing" surrounding Williams's studies at USM lasted for at least seven years, Allen's entire employment relationship with Morris lasted a mere four months. Unlike in Williams, MacArthur never explicitly requested a sexual or romantic relationship with Allen, Allen never complained to MacArthur's superiors about his conduct, and Allen did not claim that MacArthur had ever threatened to terminate her if she did not accept his advances. There was no direct evidentiary link between Allen's failure to embark on a sexual relationship with MacArthur and her firing. Rather, Allen merely speculated at the trial that the reason for her termination was her rejection of MacArthur's sexual advances. Allen maintained that she could not imagine any other reason for her termination. Further, this case differs from Williams because, in that case, USM officials provided no explanation for their neglectful treatment of Williams. Though Morris's evidence was rejected by the jury, Morris did submit evidence that conflicted materially with Allen's testimony as to the reason for Allen's termination and the facts and circumstances surrounding it.
¶ 60. In my opinion, Allen has not made a sufficient showing that, given the nature of the breach of contract, a compensable degree of mental anguish was both reasonably foreseeable and actually suffered by Allen. Certainly, it is reasonable for any employer to foresee that a wrongfully terminated employee such as Allen would suffer some degree of emotional discomfort. Indeed, Allen established that she suffered a period of emotional upset after the termination that primarily consisted of sleeplessness, *830 anxiety, and some weight loss. The question should be whether the employer should have foreseen that Allen would suffer a compensable degree of emotional discomfort. Otherwise, virtually every dispute concerning a breached employment contract would justify an award of mental distress damages in addition to the entirety of the employee's lost salary. Considering the facts of the instant case, I do not believe that Morris's conduct in breaching its employment contract with Allen was sufficiently offensive that Morris reasonably should have foreseen that the breach would have caused Allen to suffer a compensable degree of mental anguish.
¶ 61. Further, I would not find that Allen actually suffered a compensable degree of mental anguish. In Whitten, the court cited the case of Harbin v. Jennings, 734 So.2d 269, 273-74 (¶ 17) (Miss.Ct.App. 1999), which established that the plaintiff's proof of "periods of sleeplessness, irritability, and inability to maintain a standard body weight" was insufficient to show compensable mental anguish. Whitten, 799 So.2d at 10 (¶ 16). In Whitten, the plaintiffs recovered mental anguish damages upon proof of anxiety and sleeplessness only because of the egregiousness of the assault and battery upon them. Id. at 13 (¶ 25). The nature of the incident sub judice amounted to an ordinary employment dispute and was not as egregious as the intentional torts in Whitten or the university's conduct in Williams. Therefore, I believe Allen was required to show actual mental anguish consisting of greater emotional suffering than that declared to be insufficient in Harbin. However, Allen's proof of actual mental anguish paralleled that declared to be insufficient in Harbin. Accordingly, I would find that Allen did not sustain her burden of proof of actual mental anguish.
¶ 62. As a final observation, I disagree with the majority's finding that, since Morris knew Allen strongly desired to work as an anchor, Allen sufficiently showed that mental anguish was a foreseeable result of the breach of contract. To me, an employer breaching an employment contract should not be subjected to extra-contractual damages by having hired an especially enthusiastic employee rather than one with a more average level of enthusiasm for the job. I believe that basing a non-breaching party's recovery on his or her subjective state of mind is incorrect. In my opinion, the foreseeability inquiry should ask whether a breach of the contract reasonably could be expected to cause severe mental anguish to a person of ordinary sensitivity, not to one whose emotional reaction to a breach foreseeably might be exacerbated by her own eagerness to enter into the contract.
¶ 63. For these reasons, I respectfully dissent. I fear that the majority's holding will render mental anguish damages a staple remedy for practically every employee aggrieved by an employer's breach of an employment contract. I further observe that, even if mental anguish damages were proper in this case, the jury was incorrectly instructed pursuant to Williams. The jury was not "carefully instructed to separate any mental anguish and emotional distress" caused by wrongful conduct accompanying the breach of contract and to award damages only for Allen's mental anguish over the loss of her employment with Morris. See Williams, 891 So.2d at 174 (¶ 40). Finally, even if mental anguish damages were proper and the jury had been correctly instructed, I would find that the jury's award of $227,000 was too speculative based on the evidence presented at the trial. See id. at 175-76 (¶¶ 46-47). Contract damages must be proven to a reasonable certainty. Id. at 176 (¶ 47). "When the focus is on a monetary remedy, *831 that remedy must be such that the breaching party is not charged beyond the trouble the breach caused." Id. at 176 (¶ 46).
NOTES
[1] We observe that Allen's claim for breach of the implied covenant of good faith and fair dealing was not a separate avenue for obtaining mental anguish damages without the requisite proof. In an ordinary contract situation, breach of the implied covenant is afforded the same remedy as a breach of the express contract terms. Cenac v. Murry, 609 So.2d 1257, 1273 (Miss.1992). The appropriate measure of damages for breach of the implied covenant is the expectancy interest of the non-breaching party. Id.
[2] Notably, the defendants' alleged conduct in this case is similar to that of the defendants in Williams. In that case, doctoral student Davida Williams complained that a professor had prevented her from defending her dissertation because she rebuffed his sexual advances. The Court took this fact into consideration in determining that emotional distress was a foreseeable result of the breach of contract. Williams, 891 So.2d at 174 (¶ 39). In the present case, Allen also contends that her rejection of MacArthur's sexual advances led to her demotion and firing. Such egregious behavior leads us to find that emotional distress in Allen's case was foreseeable as a result of the breach of contract.