# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00130-COA

**BRYAN C. FAGAN, M.D.**                                            **APPELLANT**

**v.**

**JUDY FAULKNER**                                                    **APPELLEE**

DATE OF JUDGMENT:                01/14/2022
TRIAL JUDGE:                     HON. JOHN R. WHITE
COURT FROM WHICH APPEALED:       LEE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         MARK NOLAN HALBERT
                                 BRANDI ELIZABETH SOPER
ATTORNEY FOR APPELLEE:           DENNIS HOWARD FARRIS JR.
NATURE OF THE CASE:              CIVIL - TORTS-OTHER THAN PERSONAL
                                 INJURY & PROPERTY DAMAGE
DISPOSITION:                     REVERSED AND RENDERED - 04/11/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Judy Faulkner sued Dr. Bryan Fagan for defamation of character and intentional infliction of emotional distress in the County Court of Lee County. At the time of the incident at issue, Faulkner was a surgical scheduler at the center where Dr. Fagan, an orthopaedic surgeon, worked in Tupelo, Mississippi. The suit arose from a one-time outburst Dr. Fagan had in the operating room where he called Faulkner a "f--king c-nt" ("FC") in front of approximately four other individuals after the parties had an argument over surgical scheduling.

¶2.     After a bench trial, the county court entered a judgment in favor of Faulkner for $30,000 on the defamation claim of slander. Dr. Fagan appealed, and the Lee County

Circuit Court affirmed the county court's judgment. Now, on appeal before this Court, we find the elements of slander were not met; therefore, we reverse and render the circuit court's judgment.

**FACTS AND PROCEDURAL HISTORY**

¶3. Faulkner has been employed by North Mississippi Surgery Center in Tupelo for thirty-nine years. For approximately the last twenty years, she has worked as the clinical manager at their Ambulatory Surgery Center. Her job entailed scheduling surgeries and assigning operating rooms. Since 2010, Dr. Fagan has performed orthopedic surgeries at the same center. Although Dr. Fagan was not Faulkner's employer, he has an individual ownership interest in the surgical center. Dr. Fagan and Faulker worked together on a weekly basis before the incident and continued to do so afterward.

¶4. The incident occurred in February 2016. That day, Dr. Fagan wanted to swap two of his surgery times; so he consulted with Faulkner. Dr. Fagan's first scheduled surgery was a knee reconstruction surgery, which would take substantially longer (four to five hours) than the following shoulder surgery. Since the shoulder-surgery patient already had arrived, Dr. Fagan wanted to proceed with the shoulder surgery first so that the patient could go home sooner to recover.

¶5. Faulkner, who is in charge of surgical scheduling, informed Dr. Fagan that he could swap the surgery times. However, he would not have use of a particular piece of positioning equipment called a "Spider" that he preferred to use for the shoulder surgery because it would be in another operating room and being utilized by another surgeon. Dr. Fagan

2

testified that the "Spider" holds the arm in place during surgery, and while the shoulder surgery could be performed without the "Spider," he was trained to perform the surgery with it.

¶6.     When Faulkner informed Dr. Fagan he could switch cases but would not have access to the "Spider" device, Dr. Fagan became upset. He told Faulkner to go tell the shoulder patient's family members herself that they must wait until after the longer knee surgery. Faulkner declined to do this. Faulkner testified that Dr. Fagan repeatedly asked Faulkner what she was going to do about the case. Dr. Fagan then demanded Faulkner call her boss to talk to him. Faulkner did, but her boss was not immediately available.

¶7.     Later that day, during one of his subsequent surgeries, Dr. Fagan had the outburst at issue. Four or five individuals were in the operating room when Dr. Fagan called Faulkner a "FC." Faulkner was not present. Dr. Fagan testified that he did not call Faulkner that name because of how she performed her job; instead, "I was just upset about the situation that happened." He denied that he was trying to damage Faulkner's reputation. Word got back to Faulkner of what Dr. Fagan had called her in the operating room. No one other than Dr. Fagan, who was present in the operating room, testified to give context to the name-calling.

¶8.     The next day, Dr. Fagan called Faulkner and apologized for the argument and name-calling. Dr. Fagan also apologized to everyone who was present in the operating room. Dr. Fagan then apologized to Faulkner in person at the surgery center. Faulkner requested that Dr. Fagan also apologize to her in the presence of the entire staff at the surgery center. Dr.

Fagan agreed, and the semi-public apology was arranged. The parties continued to work together with no further arguments or outbursts by Dr. Fagan.

¶9. Approximately one year later, in February 2017, Faulkner sued Dr. Fagan for defamation and intentional infliction of emotional distress in the County Court of Lee County. In July 2021, a bench trial was held. At the end of Faulkner's case-in-chief, Dr. Fagan moved for a directed verdict, which was denied. He renewed his motion at the close of his case-in-chief, which was denied as well.

¶10. Following trial, the county court issued a bench ruling, finding in favor of Faulkner on her defamation claim of slander but finding Dr. Fagan not liable for intentional infliction of emotional distress. The trial court rendered a $30,000 judgment against Dr. Fagan for slander. The trial court found that Dr. Fagan was upset with Faulkner, "believing that she did not do a good job of scheduling surgeries," and used some hurtful words. The court also found that by the next day, it had become "common knowledge" in the surgical center that Dr. Fagan was not pleased with the way Faulkner did her job and had referred to her as a "FC." Even though family and coworkers testified that Faulkner suffered hurt feelings and a loss of confidence at her job, the trial court found Faulkner did not incur any monetary damages. Legally, the trial court found Dr. Fagan's words were slander per se, citing in support *McFadden v. United States Fidelity and Guaranty Co.*, 766 So. 2d 20 (Miss. Ct. App. 2000).

¶11. Dr. Fagan appealed to the Lee County Circuit Court. Faulkner did not appeal the ruling on her claim for intentional infliction of emotional distress. In January 2022, the

4

circuit court affirmed the trial court's judgment, finding sufficient evidence that Dr. Fagan's words were actionable under the law of slander and sufficient evidence to support the verdict.

## STANDARD OF REVIEW

¶12.   "When the county court sits as the fact-finder, the circuit court and this Court, as appellate courts, 'are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong.'" *Turnage v. Brooks*, 301 So. 3d 760, 763 (¶9) (Miss. Ct. App. 2020) (quoting *Bacallao v. Madison County*, 269 So. 3d 139, 144 (¶21) (Miss. Ct. App. 2018)). Moreover, "when reviewing a county court's findings of facts and conclusions of law . . . 'the judgment of a circuit or county court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree.'" *Bacallao*, 269 So. 3d at 144 (¶21) (quoting *Patel v. Telerent Leasing Corp.*, 574 So. 2d 3, 6 (Miss. 1990)). However, "[i]f the trial court's findings were manifestly wrong or the court applied an erroneous legal standard, [the reviewing court] will not hesitate to reverse." *Bradley v. Tishomingo County*, 810 So. 2d 600, 602-03 (¶11) (Miss. 2002) (citing *Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992)). Questions of law are reviewed de novo. *Okoloise v. Yost*, 283 So. 3d 49, 55 (¶22) (Miss. 2019).

## ANALYSIS

¶13.   Dr. Fagan argues that the trial court committed manifest error in ruling that Dr. Fagan's words were actionable as defamation per se. Additionally, he argues no evidence showed that the name-calling attacked Faulkner's professional capacity or was made

5

regarding Faulkner's ability to perform her job. Therefore, he contends the trial court made improper inferences about the meaning of Dr. Fagan's name-calling. Finally, Dr. Fagan argues that the trial court improperly relied on *McFadden* to support its ruling.

¶14. "The tort of defaming a person's character or reputation through the spoken word is actionable under the common law doctrine of slander." *McFadden*, 766 So. 2d at 23 (¶12) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts §111 (5th ed. 1984)). To prove slander in Mississippi, the following elements must be shown:

> (a) a false statement that has the capacity to injure the plaintiff's reputation;

> (b) an unprivileged publication, i.e., communication to a third party;

> (c) negligence or greater fault on part of publisher; and

> (d) "either actionability of statement irrespective of special harm or existence of special harm caused by publication."

*Speed v. Scott*, 787 So. 2d 626, 631 (¶21) (Miss. 2001) (quoting *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998)). The last element "requires proof of 'special harm' unless the statements were actionable per se." *Id.* at 632 (¶25). "Special harm is the loss of something having economic or pecuniary value. . . ." *Id.* (quoting Restatement (Second) of Torts § 575 cmt. b (1977)). Proof of special damages is not needed for slander per se because the law presumes certain types of defamation cause damages from hurt feelings and ruined reputation. *Cook v. Wallot*, 172 So. 3d 788, 798 (¶33) (Miss. Ct. App. 2013) (quoting *McFadden*, 766 So. 2d at 23 (¶12)). Five categories of words are recognized as slander per se. No special harm is needed for "[w]ords imputing a want of integrity or capacity, whether

6

mental or pecuniary, in the conduct of a profession, trade or business[.]"[1] *Speed*, 787 So. 2d at 632 (¶27) (quoting *W.T. Farley Inc. v. Bufkin*, 159 Miss. 350, 355, 132 So. 86, 87 (1931)).

¶15. The trial court ruled that all the elements of slander were met, finding that Dr. Fagan uttered a false and unprivileged statement intentionally made to third parties, which was actionable per se. Specifically, the trial court found that because there was no proof Faulkner did a poor job but instead a good job, the statement was false. While the statement may have been a privileged communication between employees, the trial court also found that under the context of how the words were used, there was malice in the words, which made it unprivileged. The trial court noted examples of the malicious tone were Dr. Fagan's telling Faulkner to call her boss, the intensity of the expletives used, and the dissatisfaction Dr. Fagan expressed with her surgery scheduling. The trial court found the words were intentionally made, thus satisfying the element of "negligence or greater fault" of the speaker. The court also found the words caused no special harm; they were actionable per se, irrespective of harm. Importantly, the court found that the words met the standard of slander per se because they "imput[ed] a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business." The trial court found the words

---

[1] The five categories of words recognized as slander per se follow: "(1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment. (2) Words imputing the existence of some contagious disease. (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof. (4) *Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business; and . . .* (5) *words imputing to a female a want of chastity*." *Speed*, 787 So. 2d at 632 (¶27) (emphasis added) (internal quotation marks omitted).

were actionable because Dr. Fagan uttered the expletives in the context of Faulkner's job performance, not just in a moment of exasperation.

¶16.    The trial court's ruling that the elements of falsity (unprivileged due to malice) and actionability were met was based on the finding that Dr. Fagan used the words as commentary on Faulkner's job performance.[2]  We do not find that to be the case.

¶17.    "The common law has always differentiated sharply between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse."  Rodney A. Smolla, *Law of Defamation*, § 4:7 (2d ed. 1999).  "Such statements may be hurtful to the listener and are to be discouraged, but . . . are not actionable" "no matter how obnoxious, insulting, or tasteless." *Id.* § 4:8 (citing *DeAngelis v. Hill*, 847 A.2d 1261, 1268 (N.J. 2004)).   Therefore, courts distinguish between defamatory statements and name-calling. *Id.*

¶18.    The Mississippi Supreme Court has recognized that "name calling and verbal abuse are to be taken as statements of opinion, not fact, and therefore will not give rise to an action for libel."[3] *Johnson v. Delta-Democrat Pub. Co.*, 531 So. 2d 811, 814 (Miss. 1988) (citing

---

[2] The only element not based on this finding is that the words were spoken with negligence or greater fault.  We agree that Dr. Fagan's words were intentionally made.

[3] Regarding verbal abuse, the Restatement (Second) of Torts explains:

There are some statements that are in form statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse.  A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more.  This is true particularly when it is obvious that the speaker has lost his temper and is merely giving vent to

8

*Ferguson v. Watkins*, 448 So. 2d 271, 276 (Miss.1984)). Further, "[o]pinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion." *Ferguson*, 448 So. 2d at 276 (citing Restatement (Second) of Torts § 566). "The defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture." *Johnson*, 531 So. 2d at 813 (quoting *Ferguson*, 448 So. 2d at 275). With regard to a claim for defamation, whether a statement constitutes an opinion is a question of law . . . ." *Meridian Star Inc. v. Williams*, 549 So. 2d 1332, 1335 (Miss. 1989), *overruled on other grounds by Roussel v. Robbins*, 688 So. 2d 714 (Miss. 1996); *see also Tipping v. Martin*, No. 3:15-cv-2951-BN, 2016 WL 397088, at *4 (N.D. Texas, Feb. 2, 2016) (citing *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)). In determining whether any statement is actionable, the plaintiff bears the burden of proving a statement's falsity. *Hays v. LaForge*, 333 So. 3d 595, 603 (¶22) (Miss. Ct. App. 2022) (citing *Jernigan v. Humphrey*, 815 So. 2d 1149, 1153 (¶14) (Miss. 2002)).

¶19. Dr. Fagan cites the Louisiana Court of Appeal's decision in *Groff v. Southwest Beverage Company*, 997 So. 2d 782 (La. Ct. App. 2008), for the proposition that expressions amounting to mere obscenities or profanity cannot be considered "false" for

---

insult. Thus when, in the course of an altercation, the defendant loudly and angrily calls the plaintiff a bastard in the presence of others, he is ordinarily not reasonably to be understood as asserting the fact that the plaintiff is of illegitimate birth but only to be abusing him to his face. No action for defamation will lie in this case.

Restatement (Second) of Torts § 566 cmt. e.

9

purposes of defamation. In *Groff*, a manager's single outburst of profanity and desk-pounding toward an employee was insufficient to support the employee's claim for defamation. *Id.* The employee testified that after a safety meeting, a tirade commenced, where a manager told him to "sit the f..k down, shut the f..k up, and wipe that f.....g smile off my face." *Id.* at 785 n.3. The appellate court found the employee did not prove the falsity element of defamation. *Id.* at 788. The *Groff* court "fail[ed] to see how the profanities [the manager] yelled could ever be true or false." *Id.* While we do not condone Dr. Fagan's outburst, we fail to see how the words "FC" could be considered true or false in the context in which they were spoken. Dr. Fagan lost his temper over the surgical scheduling and uttered these unfortunate expletives. It was his matter of opinion at the time.

¶20. The reviewing court must consider the offending words "in the context of the entire utterance. Their complexion draws color from the whole." *Hays*, 333 So. 3d at 603 (¶22) (quoting *Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990)). Here, Dr. Fagan's name-calling and verbal abuse were made in the operating room. No one else who was present in the operating room testified to provide any context. Faulkner argues, however, that the words "FC" were not mere name-calling but related Faulkner's job performance; thus, the words were actionable per se. "In applying this principle courts will seek to distinguish between allegations germane to the person's business reputation and allegations that deal only with personal matters, or even business matters that do not tend to injure one's standing within one's business and professional  world." Smolla, *Law of Defamation* § 7:14. In order to be actionable, generally disparaging words "must affect the plaintiff in some way

10

which is peculiarly harmful" to a person's profession. Restatement (First) of Torts § 573 (1938).[4]

¶21.  No evidence showed that Dr. Fagan called Faulkner this expletive because he was disparaging her professional capabilities.  Dr. Fagan testified that he did "[n]ot necessarily" use the words because he did not like how she performed her job; instead, he "was upset about the situation that happened, and that was just what I said."  He testified that he "was not happy that the cases didn't get switched.  That was the whole point of the argument."  He later testified, "I don't think I was making a generalized statement at that point about how she overall does her job. . . .  I think it was more . . . about that situation. . . .  That I don't think it was handled correctly."  He also testified that he was upset and embarrassed by what he said, that he should not have said it, and that he has not used that language since then.

¶22.  Further, we find no evidence connecting Dr. Fagan's words to the context of Faulkner's professional world.  Faulkner's slander claim was related only to the one-time name-calling by Dr. Fagan.  He was upset about the situation at the time, and the words were not spoken as a false or defamatory statement of fact.  None of the other individuals present in the operating room testified about the name-calling or its context; Dr. Fagan alone admitted to calling Faulkner the "FC" name.  During adverse cross-examination, Dr. Fagan recollected the context of the "FC" words spoken in the operating room:

---

[4] The Restatement gives the following example, which is instructive here: a statement about a physician consorting with "harlots" is not actionable per se, but a charge that he makes improper advances on his patients is actionable per se because it impacts his reputation as a physician. *Id.*

> I don't recall which surgery we were in. I think it's fairly clearly documented in the record who was in the room, and sometimes in surgery the conversation is not always the best topic. And the "C" word was being talked about in surgery, and that's when I made the comment about Judy. . . . The only thing I remember saying is that Judy is that.

Faulkner testified that on the day after the incident when she heard she was called a "FC," she "didn't understand why all of a sudden I was the bad person to be called such degrading names." This testimony shows there was no prior context for Dr. Fagan's name-calling. Even after the incident, Faulkner continued to work at the clinic and interact with Dr. Fagan throughout this litigation with no further issues. There is no possibility that the words "FC" could be given the meaning ascribed by Faulkner without being the product of innuendo, speculation, or conjecture. The words, however vulgar, are simply not actionable in Mississippi.

¶23. Faulkner claims Dr. Fagan made other profane statements about Faulkner's inability to perform her job. However, the trial court did not make this finding, and the evidence would not support it. At trial, plaintiff's counsel asked Dr. Fagan if he stated, "This place isn't run the right f-----g way. It will never get better with c----, like Judy, running the f-----g desk." Dr. Fagan responded, "I do not recall saying that statement. I'm not saying it wasn't said, but I do not recall saying that." On appeal before this Court, Faulkner improperly represents that Dr. Fagan "acknowledged" the statement, and therefore the "FC" words were related to her job abilities. The dissent also concludes that this statement "directly implicated her professional ability" and notes that "Dr. Fagan did not unequivocally deny [the statement's] existence." With all respect to the dissent, there was no positive evidence

12

that Dr. Fagan actually made this statement. No one was called to testify that the statement was in fact made, just as no one testified as to the context of the words "FC" spoken in the operating room. If the statement had been made, Faulkner should have called someone to testify to that effect.[5] The only statement explicitly before and analyzed by the trial court was Dr. Fagan "calling Faulkner a 'FC.'"

¶24. The circuit court erroneously found it was "reasonable for the trial court to infer the intent of Dr. Fagan's statement as referencing Faulkner's abilities within her profession." The circuit court made this finding after stating that "[t]he trial court heard testimony that the slanderous comments were made in relation to Faulkner's ability to perform her job." Although unclear, the circuit court appears to be referencing the statement Dr. Fagan made that he neither admitted nor denied, rather than his single reference to her as a "FC." The circuit court erred in relying on evidence that was not proved at trial.

¶25. Additionally, as to the only statement proved in the record (calling Faulkner a "FC"), we find the trial court erred in finding *McFadden* analogous. In *McFadden*, a physician sued an insurance adjuster and company for slander. *McFadden*, 766 So. 2d at 21 (¶1). The physician's patient was injured in a motor vehicle accident. *Id.* at (¶2). In a telephone conversation, the patient informed her insurance adjuster that she was being treated by Dr. McFadden for her injuries. *Id.* The adjuster responded that Dr. McFadden was a "crackpot" and a "quack," telling the patient that he would be unwilling to work further to settle her

_____

[5] If Faulkner could have proved this statement was made, her claim for slander would have been much stronger because it would have linked the offending words to her job performance.

13

claim if she continued treatment with that physician. *Id.* She informed the physician of the adjuster's comments when she called him to cancel her treatment. *Id.* at 22 (¶3). Dr. McFadden claimed the words "crackpot" and "quack" were made in the context of his suitability as a treating physician for the patient's injuries. *Id.* at (¶4). He argued the terms were slanderous per se because they tended to "diminish his esteem as a physician or to excite adverse or derogatory feelings against him in his professional capacity." *Id.* The trial court disagreed and granted the defendants' motion for a directed verdict on the slander issue, finding the words were merely "offhand remarks." *Id.* at (¶6). On appeal, however, this Court found the trial court's ruling on slander was manifest error and remanded that claim. *Id.* at 24, 26 (¶¶14, 25). This Court held that the adjuster's remarks,[6] in the context of the telephone conversation, were intended to disparage Dr. McFadden's abilities as a physician and would tend to ridicule and embarrass him in his professional life. *Id.* at 24 (¶14).

¶26.    A more analogous case is *Tipping v. Martin*, No. 3:15-cv-2951-BN, 2016 WL 397088 (N.D. Tex. Feb. 2, 2016). In *Tipping*, an off-duty journalist had an altercation with a sculptor at an art festival. *Id.* at *1. The female journalist took photographs of artwork without the permission of the sculptor, who became upset. *Id.* He told her the sculpture was protected by copyright and demanded she delete the photographs from her digital camera. *Id.* She refused and showed him her press badge. *Id.* at *2. The sculptor became irate and

_____

[6] This Court noted that while the term "'crackpot' does not necessarily speak to a person's abilities in the medical profession," a jury could reasonably conclude in the context of the conversation that it was directed at Dr. McFadden's professional abilities. *Id.* at 24 (¶14).

"shouted that 'if' [she] was a journalist, she was a 'whore, cunt journalist slut.'" *Id.* He continued to repeatedly shout this statement, "whereupon [the journalist] displayed her middle finger to Defendant, who took a picture of same." *Id.* Ultimately, the journalist lost her job due to the photograph of her middle finger. *Id.* at *3. The journalist sued the sculptor for numerous claims including defamation, but the district court granted the defendant-sculptor's motion to dismiss. *Id.* at *3, 5. The defendant argued that the insulting statement was one of opinion, not fact, and did not rise to the level of defamation. *Id.* at *4. The district court looked at the context of the statement and reasoned that although "cunt" may impute an unchaste female, under the circumstances the insult was not "intended to be taken literally as statements of fact." *Id.* at *5.[7] The district court noted the sculptor had no knowledge of "her personal life or the quality of her work as a journalist." *Id.* The district court concluded that "[p]urely subjective assertions or opinions that do not imply the existence of undisclosed facts and do not misconstrue the facts are not actionable as defamation. . . . '[T]he law provides no redress for harsh name-calling.'" *Id.*

¶27.    Here, the trial court found *McFadden* was analogous because Dr. Fagan's words spoken to Faulkner were an attack on her ability to schedule surgeries. We disagree and find the court was manifestly wrong. No evidence shows the words "FC" were used in the context of a conversation about Faulkner's professional abilities. As in *Tipping*, the name-calling was a statement of opinion by Dr. Fagan after an argument with her. No contextual evidence was provided to prove otherwise. If the words spoke to anyone's professionalism,

_____

[7] In our case, Faulkner has made no claim that Dr. Fagan was attempting to impute an unchaste character to her.

15

they spoke to his, not hers.[8]

## CONCLUSION

¶28.   The county court erred in entering judgment in favor of Faulkner. The finding that Dr. Fagan's statement was slander was unsupported by substantial evidence and manifestly wrong. The words were not actionable as slander per se because the evidence fails to show Dr. Fagan spoke them in relation to Faulkner's job capabilities. Accordingly, we reverse the circuit court's order affirming the county court's judgment and render judgment in favor of Dr. Fagan.

¶29.   **REVERSED AND RENDERED.**

**WILSON, P.J., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., DISSENTING:**

¶30.   Q.    Okay. In an operating room, you made an offensive comment about Judy Faulkner, correct?
       A.    I made the statement that we were talking about.
       Q.    You called her a fucking cunt?
       A.    Yes.

---

[8] Similarly, in *Gahafer v. Ford Motor Company*, 328 F. 3d 859 (6th Cir. 2003), the United States Court of Appeals for the Sixth Circuit held that a vulgar, profane tirade spoken by a supervisor against an employee was not slander per se under Kentucky law. *Id.* at 863. The plaintiff unsuccessfully argued that the supervisor's statements were actionable per se because they accused him of not doing his job. *Id.* at 862. The Sixth Circuit disagreed, finding the tirade did not attack the employee's "skills, honesty, integrity or character." *Id.* To the contrary, the outburst showed the supervisor's frustration at the employee's time commitment to the project. *Id.* at 862. "The foulness of [the supervisor's] words does not change the very substance and meaning of the message. No matter how sliced, the words at issue here did not 'expose the plaintiff to public hatred, ridicule, contempt or disgrace. . . .'" *Id.* at 863.

16

Q. That's because you couldn't flip your surgeries around, correct?
A. I was upset about not being able to change the order of the cases.

– *Dr. Bryan Fagan* (*during trial of this matter on July 21, 2021*).

¶31. Nearly a century of law allows a Mississippian to file a lawsuit against another when there is "any attack on the capabilities of a plaintiff in [her] trade or profession." *McFadden v. United States Fidelity and Guar. Co.*, 766 So. 2d 20, 24 (¶13) (Miss. 2000).

¶32. Because there was testimony heard at trial by the county court that the doctor in this case verbally attacked the work performance of a nurse at the clinic he partly owned, we are bound to give this verdict the benefit of all favorable inferences that may be reasonably drawn. Because we do not, and in turn ignore decades of law and the evidence in this case, I respectfully dissent.

¶33. Our law has long recognized one may protect their business reputation through a lawsuit. *W.T. Farley Inc. v. Bufkin*, 159 Miss. 350, 132 So. 86, 87 (1931) (examining whether the phrases "[i]f you were a lady you would pay us, . . . [y]ou are just a bunch of crooks and you are not ladies, and you are just damn liars" constituted slander per se). For "[w]ords imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade, or business are slanderous per se." *Great Atl. & Pac. Tea Co. v. Majure*, 176 Miss. 356, 167 So. 637, 638 (1936).

¶34. This does not mean that all words are actionable; our court system does not exist to safeguard hurt feelings or to shield delicate ears. *See Speed v. Scott*, 787 So. 2d 626, 627 (¶2) (Miss. 2001) (calling another firefighter a "liar and thief" was not sufficient). But when the words used can damage another's ability to do business, or their reputation for business,

17

we have allowed a lawsuit to go forward. For instance, we have deliberated over whether it was harmful to a doctor when an insurance adjuster called him a "quack" and a "crackpot," causing a client to seek other treatment. *McFadden*, 766 So. 2d at 21 (¶2).

¶35. During trial, the lower court granted a directed verdict, finding the use of these words "did not give rise to sufficient evidence that would sustain a jury's verdict in the case on a slander issue." *Id*. at 22 (¶6). The trial court simply characterized the adjuster's statements as "offhand remarks"—in other words, that he could not sue simply because his feelings were hurt. *Id*.

¶36. But on appeal, we found this was a departure from precedent. *Id*. at 24 (¶14). We first applied a two-part rule in determining whether remarks constitute slander. *Id*. First, as a matter of law, "it is . . . the trial court's decision as to whether a particular remark in its commonly understood meaning is capable of being construed as slanderous." *Id*. Second, as a question of fact, "[i]t is . . . the jury's decision as to whether, on the particular facts, the remark did, in fact, defame the person subjected to the comment." *Id*.

¶37. As to the particular impact of the words "quack" and "crackpot," we pointedly noted the trial court appeared "to have simply brushed the alleged statements aside as being of insufficient gravity to warrant legal redress." *Id*. at (¶15). Regardless of what the trial court thought about those statements, they were indeed about his business practices. *Id*. "We are aware of no such de minimis rule in the law of slander," we held, and so "[t]hose considerations more properly are for the consideration of the jury in the area of assessing such damage as would appear warranted in view of the totality of the circumstances in which

18

such patently derogatory remarks were offered." *Id.* In other words, perhaps a jury might consider "quack" to warrant damages, or not—but it did pass *legal* muster.

¶38. Since the words had impugned the doctor's professional practice, "once competent evidence was presented that would, if believed by a jury, support the conclusion that the remarks were made, the trial court was without authority to interpose its own view of whether the doctor was defamed." *Id.* at 25 (¶17). This was a matter that could be resolved only by the jury. *Id.*

¶39. As we apply *McFadden* to this case, it is important to note that the background here is largely uncontested. Dr. Bryan Fagan wanted to swap patients one day so he could use a preferred machine for shoulder surgery. But he had a knee reconstruction scheduled first. The doctor wanted to do the operations in the order he wanted, not how they were scheduled by the nurse at the clinic.

¶40. The nurse in charge of scheduling, Judy Faulkner, flatly told him the surgeries would not be rearranged at his whim. Dr. Fagan later testified:

> I was upset at the situation of not being able to switch my cases. And in that discussion with Ms. Faulkner, when I was made aware I would not be able to switch them, I asked her to go tell the family that they would have to wait. And I was told no.

¶41. The doctor further told the trial court he sometimes had a problem with the way Faulkner scheduled his surgeries. "It's all up to Judy," he lamented.

¶42. So after the blunder with the surgeries—and after the nurse told him that she would not tell the patients they would have to wait—the doctor pitched a fit. Dr. Fagan testified "the 'C' word was being talked about in surgery, and that's when I made the comment about

19

Judy."

Q. So you said it - -
A. It was my opinion. Just - -
Q. So you stated that Ms. Judy was a cunt to many other people?
A. There were four or five people in the room.
Q. And you specifically said Ms. Judy Faulkner whenever you were using the word cunt?
A. I used her first name, yes.
Q. Because you didn't like how she performed her job; is that correct?
A. Not necessarily. I was upset about the situation that had happened, and that was just what I said.
. . . .
A. I was not happy that the cases didn't get switched. **That was the whole point of the argument**.

(Emphasis added). But the doctor was careful in admitting exactly what he said during his outburst at work:

Q. . . . And did you say, *This place isn't run the right fucking way. It will never get better with cunts, like Judy, running the fucking desk?*
A. I don't recall saying that statement.
Q. You don't recall saying it?
A. I do not recall saying that statement. **I'm not saying it wasn't said, but I do not recall saying that**.

(Italics in original and bold added).

¶43. Under oath, Dr. Fagan equivocated whether his outburst was a personal attack or a professional one. Specifically, he stated, "I did not think I was making a generalized statement at that point about how she overall does her job." He attempted to narrow his frustration to the particular situation, stating he didn't think it was handled correctly.

¶44. According to the doctor, those present during his outburst were all women, either two or three surgical technicians, possibly a nurse, and a nurse anesthetist. All were employees of the surgery center in which he had an ownership interest, and all worked closely with Ms.

20

Faulkner.

¶45.    The facts as heard by the trial court, sitting without a jury, were uncontested that the outburst occurred: (1) at a workplace where both the doctor and the nurse worked—the surgery clinic; (2) during work hours; (3) actually during a surgery on a patient; (4) in front of other staff members at the clinic; (5) because the doctor was triggered that he "was not happy that the cases didn't get switched," and his frustration about scheduling "**was the whole point of the argument**" with Ms. Faulkner; (6) after the nurse had refused the doctor's demand she tell the patients they would have to wait; and (7) directly implicated her professional ability—specifically, whether the clinic was "*run the right fucking way*," and whether it could ever "*get better with cunts, like Judy, running the fucking desk.*" (Emphasis added).  And when asked why he was so mad, the doctor told the trial court, "I was upset about not being able to change the order of the cases."

¶46.    Therefore the trial court had before it evidence that supported a cause of action as recognized by *McFadden*, the same type of claim which can be traced back to the 1930s. This wasn't someone just screaming vulgarities at someone online, or a firefighter saying another was a thief.  These were work colleagues, in the workplace, and it was *about* work, and reasonable minds could believe that the doctor was commenting adversely on the professional conduct of the nurse.  As counsel for the nurse argued in closing before the county court, "This isn't about the use of the 'C' word and the F'ing 'C' word so much as it is about her being able to do her job."

¶47.    In affirming, the circuit court concluded that "[t]he only real dispute is whether the

slander was actionable, or simply amounted to name-calling." The trial court heard testimony that the slanderous comments were made in relation to Faulkner's ability to perform her job. While Dr. Fagan did not unequivocally admit to the statement connecting the two, he also did not unequivocally deny its existence. As such, it was reasonable for the trial court to infer the intent of Fagan's statement as referencing Faulkner's abilities within her profession. Upon that finding rested the circuit court's conclusion that "there existed sufficient evidence for the trial court to find that Fagan's statements were not simply vulgarities, or profanities, but were actionable under the law for slander, irrespective of special harm."

¶48.   Our standard of review compels us "to view the evidence in a light most favorable to the jury's verdict, giving [it] the benefit of all favorable inferences that may reasonably be drawn." *Cade v. Walker*, 771 So. 2d 403, 407 (¶8) (Miss. Ct. App. 2000). Given that standard of review, there is ample record evidence that this case is not about a stray profane remark but, instead, an attack on a person's professional ability. The fact-finder heard the evidence and found Dr. Fagan's remarks support a cause of action and warranted damages. Given our deferential standard on appeal, we must not disturb the trial court's finding.

¶49.   Therefore, I respectfully dissent.

   **CARLTON, P.J., WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**

22